**Leon RUSHING, Plaintiff,**

v.

**UNITED AIRLINES, et al., Defendants.**

No. 94 C 5075.

United States District Court,
N.D. Illinois,
Eastern Division.

March 27, 1996.

Elliot R. Zinger, Jason Emil Orth (Elliot Zinger & Associates), Chicago, IL, for Plaintiff.

John Craig Busey, John W. Dietrich, Chicago, IL, for Defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Leon Rushing ("Rushing") has brought this action by reason of claimed sexual harassment on the part of Guy Montes ("Montes"), his supervisor at their joint employer United Airlines ("United"). Rushing asserts both a statutory claim under Title VII of the Civil Rights Act of 1964 ("Title VII," 42 U.S.C. §§ 2000e to 2000e–17)[1] and supplemental state law claims charging intentional infliction of emotional distress, negligence in training and supervision, and ratification.

Defendants now move for summary judgment under Fed.R.Civ.P. ("Rule") 56. Both sides have complied substantially[2] with this District Court's General Rule ("GR") 12(M) and 12(N), which has been adopted to highlight the existence or nonexistence of any material factual disputes. At this point, then, the motion is fully briefed and ready for decision. For the reasons set out in this memorandum opinion and order, the motion is granted as to all counts except for Rushing's intentional-infliction-of-emotional-distress claim against Montes, which is dismissed without prejudice.

**1.** Citations to Title VII provisions will take the form "Section—," referring to the Title 42 numbering rather than to Title VII's internal numbering.

**2.** This qualifying adverb "substantially" is occasioned by Rushing's responsive submission, which is not really faithful to the requirements of GR 12(N)—see the Appendix.

**3.** This opinion will use "P." and "D." rather than the parties' names in citing to their respective exhibits and memoranda. Each deposition or

## Summary Judgment Standard

Under familiar Rule 56 analysis, defendants have the burden of establishing both the lack of a genuine issue of material fact and their entitlement to summary judgment as a matter of law (*Celotex v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For those purposes this Court is called upon to draw inferences in the light most favorable to nonmovant Rushing, but it is "not required to draw every conceivable inference from the record—only those inferences that are reasonable" (*Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991) and cases cited there). What follows in the *Facts* section is a version of the facts drawn from the parties' submissions,[3] with any differences between them resolved in Rushing's favor.[4]

## Facts

Rushing has been employed by United as a ramp serviceman since 1984 (Complaint and Answer ¶ 11). Montes, who has been employed by United since 1964, has been an air freight supervisor since 1979 (Montes Dep. 6, 8–9; Lampe Aff. ¶ 4). At the time of the alleged harassment, Rushing and Montes both worked on the same shift in United's air freight area.

Before this opinion moves on to the details of Rushing's allegations, it will be helpful to discuss briefly the somewhat confusing hierarchy of command in the air freight area. All employees in that area—supervisors and ramp servicemen alike—report to United's Cargo Services Manager Jack Lampe ("Lampe"). Air freight supervisors rank below Lampe in the hierarchy. Their exact role is somewhat unclear from the parties' submissions. There are however a number

affidavit will be identified by the name of the deponent or affiant.

**4.** For that reason this opinion will for the most part simply dispense with such terms as "alleged" or "claimed" or the like, even though Rushing's version of events may be vigorously contested by defendants. Where Montes' denial of Rushing's assertions is also set out here, that is purely informational—those denials are not credited on the current motion.

of aspects of their job that are covered by the information provided by the litigants, and those will be identified next.

Thus the supervisors have the general responsibility for ensuring that ramp servicemen do their jobs (Montes Dep. 36), but they do not have the power to hire, fire, promote or demote the servicemen (Montes Dep. 162; Lampe Aff. ¶ 4). Supervisors can however initiate discipline proceedings against ramp servicemen in the form of a "write-up" (Montes Dep. 50).[5] Once discipline proceedings have been commenced against a ramp serviceman, supervisors do not have the power to dismiss or alter the proceedings (Lampe Aff. ¶ 5; Walther Dep. 94–96).

Supervisors also play a role in doling out job assignments to ramp servicemen, depending on the need during a particular shift. Those jobs, which include unloading cargo, running freight, cleaning up the building and dumping the mail (Montes Dep. 36), are spelled out explicitly in the collective bargaining agreement ("CBA") between United and the International Association of Mechanics and Aerospace Workers ("Union") (Montes Dep. 159; Lampe Aff. ¶ 6). Supervisors assess the situation and then tell a "lead ramp serviceman" what needs to be done (Curry Dep. 14). Then the "lead" bears the responsibility for assigning jobs to particular employees (Montes Dep. 162–63; Rushing Dep. 22). When the lead is not present, supervisors step in and hand out assignments, something that occurred quite often on the shift that Montes and Rushing worked (id. at 22, 39; Montes Dep. 52, 163). Although seniority plays some role, the person who passes out assignments (whether it be the lead or the supervisor) has the discretion to assign to servicemen any job that falls within the CBA and that needs to be done at a particular time. At no time did Rushing report directly to Montes, and Rushing admits that the extent of Montes' control over him was limited to Montes' ability to initiate

discipline and to pass out job assignments (P.Mem. 2–3).

At the heart of this case is Rushing's contention that Montes repeatedly asked Rushing to perform fellatio on Montes. Rushing says that Montes repeatedly used the phrase "suck my dick" when speaking with Rushing (e.g., Rushing Dep. 26, 28–33, 51–52). Rushing cannot recall the number of times Montes used the phrase or when Montes first used it (id. 13), but he says that Montes used the term on "several" occasions (id. 51). Although Rushing admits that at first he perceived Montes' usage as only figurative, Rushing says that he eventually perceived Montes to be serious in his request for oral sex (id. 30–31). For his part Montes admits using the phrase "suck my dick"—among other profanities—toward Rushing and other employees (Montes Dep. 33, 74), but he denies that he ever said it with sexual intent (id. 81–82, 165–66). Montes also contends, and other air freight area employees corroborate, that on more than one occasion Rushing used the phrase "suck my dick" toward Montes (Montes Dep. 169; Curry Dep. 99, 105–06; Lampe Aff. ¶ 16). But Rushing denies ever using the phrase toward Montes (Rushing Dep. 27), and his version must be credited on the current motion.

In addition to that general summary, Rushing chronicles two incidents in more detail. Rushing says that on one occasion (he cannot provide a date) when he and Montes were alone in a van as Montes transported Rushing from one part of the freight area to another, Montes asked Rushing to perform oral sex on him (Rushing Dep. 32). When Rushing refused, Montes said "Let me suck yours then" (id.). When Rushing again refused, Montes pointed to another ramp serviceman—a man rumored to be homosexual[6]—and told Rushing that the worker had performed oral sex on Montes "real good," and once again asked Rushing, "Why don't you do me now?" (id. 32). Montes then reached over to try to touch Rushing's lap

5. United's progressive discipline procedure for ramp servicemen moves through five levels, with Level 5 being the most serious (D.Mem. 4 n. 3). As might be expected, a ramp serviceman is assessed a Level 1 for the first violation, a Level

2 for the second and so on through a Level 5 discipline, which can result in discharge.

6. This rumor is mentioned only because it tends to enhance the credibility of Rushing's story.

(*id.* 69). Rushing interrupted Montes' attempt to touch him, refused his request and asked to be allowed out of the van. Montes denies that any of those things happened (Montes Dep. 70–72).

According to Rushing, Montes made the suggestion that Rushing perform oral sex on him virtually every time that Rushing was alone in the van with Montes. At some point Rushing told some of his co-workers about Montes' repeated propositions in the van, and he says that he then became the object of jokes whenever his co-workers saw that Montes was about to transport Rushing from one area to another (Rushing Dep. 172–73). Eventually the combination of Montes' propositions and his co-workers' jokes prompted Rushing to refuse to get into a vehicle with Montes when the two would be alone (*id.* 32–33).

Another incident central to Rushing's claim occurred on April 1, 1993 when Montes was passing out daily job assignments. According to Rushing, Rushing was left without an assignment after everyone else had been assigned. When Rushing asked Montes what Montes wanted him to do (meaning a job assignment), Montes "asked [Rushing] to suck his cock and he clutched his pants" (Rushing Dep. 177). One of the other ramp servicemen, Joe Gutierrez ("Gutierrez"), witnessed that exchange and corroborated Rushing's story in a signed statement submitted with the Union grievance (P.Mem.Ex. B). Montes denies both (1) that he used any phrase like "suck my cock" on April 1, 1993 and (2) grabbing his crotch (Montes Dep. 85).

According to Rushing, that April 1, 1993 incident pushed him over the edge, and he began to contemplate filing a grievance against Montes. On April 22, 1993 Rushing, Montes and union shop steward Chester Walther ("Walther") met about the grievance that Rushing was contemplating. Montes "pleaded" with Rushing not to pursue the grievance, but to no avail: On May 5, 1993 Rushing filed a grievance alleging that

Montes had sexually harassed him during the April 1 incident.

In Step 1 of the Grievance Procedure [7] Lampe investigated Rushing's complaint. On June 3, 1993 he reached this conclusion (Rushing Dep.Ex. 6):

I've investigated this grievance with the principals. A dispute of facts remains. Both the Grievant and Mr. Gutierrez agree that there have been no subsequent problems between the parties since the alleged infraction on 4/1/93. Mr. Montes understands that only the most professional behavior on his part is acceptable.

\* \* \* \* \* \*

I do not expect any further problems between Mr. Montes and Mr. Rushing. Mr. Montes understands the seriousness of these allegations and the consequence of future allegations of this nature.

In addition to making those findings, Lampe counseled Montes on the seriousness of the allegation and transferred Montes to a different shift to limit his contact with Rushing (Lampe Aff. ¶ 12).

Rushing and Union appealed Lampe's finding, necessitating a Step 2 hearing before United Vice President Tom Powers ("Powers"). On August 31, 1993 Powers found that what had occurred, while troubling, did not constitute sexual harassment (Rushing Dep.Ex. 6):

The information presented did not show sexual implication or intent for sexual activity or leading to a sexual encounter. I do believe the behavior and foul language/remark by Supervisor Montes was unprofessional and totally inappropriate. This type of unprofessionalism on the part of management, or any other employee, will not be tolerated in the workplace.

As a result of that finding Lampe again met with Montes on September 20, 1993 (Lampe Aff. ¶ 15). Three days later Lampe issued a letter of discipline (Lampe Aff.Ex. 3) to be placed in Montes' file, warning Montes that further unprofessional conduct would subject

---

7. There is a four-step Grievance Procedure under the collective bargaining agreement between United and Union. Steps 1 through 3 take place before United hearing officers, and Step 4 is before a system board of adjustment (one Union official, one United official and a neutral arbitrator).

him to discharge, and also requiring him to attend additional Human Resources training.

Rushing was not satisfied and opted to purse the grievance to Step 3. After a March 24, 1994 hearing, hearing officer Caren Wuerl affirmed the Step 1 and 2 conclusions in a written finding dated April 19, 1994. There is no indication that the incident has proceeded to a Step 4 hearing.

Meanwhile Rushing filed a complaint with the Equal Employment Opportunity Commission ("EEOC") on September 10, 1993 (Rushing Dep.Ex. 6). On May 21, 1994 he was issued a right to sue letter, and on August 18, 1994 he filed his multicount complaint in this action. Count I is a standard sex discrimination claim under Section 2000e–2, while Count II is a retaliation claim under Section 2000e–3. Both Title VII counts target United and Montes. Rushing also invokes this Court's supplemental jurisdiction under 28 U.S.C. § 1367 ("Section 1367") to assert three state law claims:[8] Count IV charges that United was negligent in supervising and training Montes, Count V asserts that Montes intentionally inflicted emotional distress upon Rushing and Count VI (creatively titled "Ratification") claims that by not taking action against Montes United "caused Plaintiff to suffer great mental suffering, pain, physical distress, and other ailments...." This opinion treats Counts I and II separately at the outset before turning to the state law claims.

### Count I—Sexual Harassment

■ Title VII's prohibition against discrimination on the basis of sex includes sexual harassment (*Harris v. Forklift Sys., Inc.,* 510 U.S. 17, ——, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993); *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 66–67, 106 S.Ct. 2399, 2405–06, 91 L.Ed.2d 49 (1986)). Sexual harassment occurs either (1) under a "hostile environment theory" where an employer's conduct—or conduct by an employee that can be attributed to the employer—creates a work environment that is hostile or abusive

to the plaintiff (*Saxton v. AT & T Co.,* 10 F.3d 526, 533 (7th Cir.1993) or (2) under a "quid pro quo" theory where submission to sexual demands is made a condition of tangible employment benefits (*Dockter v. Rudolf Wolff Futures, Inc.,* 913 F.2d 456, 461 (7th Cir.1990).

■ Rushing has asserted both of those theories against Montes as well as United. However, *Williams v. Banning,* 72 F.3d 552, 553–54 (7th Cir.1995) has held that a supervisor in his or her individual capacity does not fall within Title VII's definition of "employer," so that Title VII does not impose individual liability on supervisors. Because *Williams* dictates that Rushing's Title VII claim against Montes must be dismissed, this opinion considers the Title VII claims only against United.

It should be said at the outset that this opinion need not and will not pause to deal at any length with the currently much-mooted question whether a charge of same-sex harassment states a claim under Title VII. This Court was one of the first to deal with that issue directly, answering that question in the affirmative some 15 years ago in a case in which plaintiff was the asserted victim of homosexual advances (*Wright v. Methodist Youth Servs.,* 511 F.Supp. 307, 310 (N.D.Ill. 1981)). Since then the judicial reviews—most of them dealing not with actual homosexual harassment but with assertedly hostile work environments caused by excessive sex-related comments and suggestive behavior lacking the element of overt homosexual advances—have been mixed (most recently, see the discussion in the two opinions in *Hopkins v. Baltimore Gas & Elec. Co.,* 77 F.3d 745 (4th Cir.1996), and a bit earlier the comprehensive—and to this Court powerfully persuasive—treatments of the issue in *Williams v. District of Columbia,* 916 F.Supp. 1, 6–9 (D.D.C.1996) and *Sardinia v. Dellwood Foods, Inc.,* No. 94 Civ. 5458(LAP), 1995 WL 640502, at *3–*6 (S.D.N.Y. Nov. 1, 1995)). Our Court of Appeals has not ruled on the matter, but *Baskerville v. Culligan Int'l Co.,*

---

**8.** Originally the Complaint included a Count III charging violation of the Illinois Human Rights Act (775 ILCS 5/1–101 to 5/10–103). After this Court's August 19, 1994 opinion pointed out that

no private right of action stems from any such violation, Rushing voluntarily dismissed Count III on September 29, 1994.

50 F.3d 428, 430 (7th Cir.1995) has certainly acknowledged the possibility that such claims are actionable.

This Court sees no reason to change its original view (when it was *Wright* in the homophonic as well as the literal sense) and therefore will not dispatch Rushing's Title VII claim on that basis.[9] But as the ensuing discussion demonstrates, he loses on other grounds.

*Hostile Environment*

■■■ To prevail on a hostile environment theory Rushing must eventually prove[10] that Montes' conduct "ha[d] the purpose or effect of unreasonably interfering with [Rushing's] work performance or creating an intimidating, hostile, or offensive working environment" (*Meritor*, 477 U.S. at 65, 106 S.Ct. at 2405). Rushing urges that because of Montes' repeated requests for oral sex, the work environment in the air freight area was hostile for Rushing.

Defendants quite predictably argue that although Montes' behavior was inappropriate and unprofessional, it was not sexual harassment. Instead United claims it was "street talk" in which both Montes and Rushing participated. Although it is doubtful that the hostile environment issue could be decided on a motion for summary judgment, that is another issue that this opinion can eschew. Why? Because even on the assumption that there was a hostile environment, it is clear that United took prompt and reasonable steps that remedied the problem as soon as

United became aware of it. Hence United cannot be held liable under Title VII.

■■ In applying the hostile environment concept, Title VII does not impose strict liability on an employer for sexual harassment committed by its employee (*Guess v. Bethlehem Steel Corp.*, 913 F.2d 463, 465 (7th Cir.1990)). Instead the question of liability vel non is decided under negligence principles[11] (*Saxton*, 10 F.3d at 535, quoting *Guess*, 913 F.2d at 465):

It is a negligence standard that closely resembles the "fellow servant" rule, from the era when industrial accidents were governed by negligence rather than workers' compensation law. Under that rule, as under Title VII, the employer, provided it has used due care in hiring the offending employee in the first place,[12] is liable for that employee's torts against a coworker only if, knowing or having reason to know of the misconduct, the employer unreasonably fails to take appropriate corrective action. The employer acts unreasonably either if it delays unduly or if the action it does take, however promptly, is not reasonably likely to prevent the conduct from recurring.

Because Rushing never complained about Montes' sexual harassment before Rushing filed a grievance on May 5, 1993 (Rushing Dep. 33, 126–27), United had no reason to know of Montes' misconduct before that date.[13] Shortly there-

---

9. Although D.Mem. 2 says that "[b]oth Rushing and Montes are heterosexual and married," and although an "equal-opportunity" sex harasser would not satisfy the Title VII test of discrimination occurring *"because* of [an] individual's ... sex"* (see *Barnes v. Costle*, 561 F.2d 983, 990 n. 55 (D.C.Cir.1977), relied on by this Court in *Wright*), on the present record there is at least a factual question as to whether Montes hit on Rushing because of his sex. If that were the only issue in the case, then, no summary judgment could be entered against Rushing.

10. Of course at this point Rushing need not *prove* anything. Instead he needs only to establish one or more genuine issues of material fact.

11. In *Jansen v. Packaging Corp. of Am.*, 895 F.Supp. 1053, 1060–61 (N.D.Ill.1995) this Court engaged in an extended discussion of the operation of agency principles in the sexual harass-

ment area. That discussion need not be repeated here.

12. [Footnote by this Court] Rushing does not contend that United was negligent in hiring Montes.

13. Rushing attempts to cloud the issue by saying that he did not report Montes' actions earlier for fear of retaliation. Rushing claims that his fear was based both on a newspaper account of a lawsuit in which United was held liable for firing an employee in 1981 after he had filed a worker's compensation claim (Rushing Dep. 127; P.Resp. Ex. A) and because of a conspiracy among supervisors to retaliate against employees who file complaints. But those contentions obscure the real issue, which is when United knew that it had a possible sexual harasser on its hands. No matter why Rushing chose not to report his problems with Montes earlier, Title

after[14] Lampe transferred Montes to a different shift so that Montes' contact with Rushing would be limited (Lampe Aff. ¶¶ 13–14). Surely that was a reasonable and prompt response to Rushing's grievance.

And at least equally importantly, the response was effective. Rushing admits that no further acts of harassment occurred after April 1, 1993 (Rushing Dep. 68). In fact, Rushing admits that since April 1, 1993 he has had only two encounters with Montes, and Montes did not request oral sex from him on either occasion (*id.*). Whatever may be said of the contacts between Montes and Rushing until April 1, 1993, the key fact is that nothing has occurred between them after Montes was transferred.

Rushing really does not have an answer. He points to Walther's deposition testimony that Lampe called Walther into his office after Rushing filed the complaint, and during that meeting Lampe allegedly impugned Rushing's reputation by insinuating that Rushing once had gang ties and that he had a "dark side" (Walther Dep. 39–43). From that Rushing asks this Court to draw an inference that United did not really care about his grievance. Similarly, Rushing urges that Lampe's investigation was a sham, pointing to the fact that Rushing's grievance was held to be without merit. Rushing also points out that from time to time Montes still supervises Rushing.

But those contentions also miss the real point that United took immediate action by transferring Montes. Rushing himself admits that the sexual harassment has ended. It does not matter whether United's remedial actions met Rushing's expectations, so long as they kept the harassment from recurring (*Saxton*, 10 F.3d at 535). Again the critical fact is that Rushing admits that no sexual harassment has occurred since United became aware of the problem and took action to remedy it.

Finally, Rushing may be suggesting (though he does not state expressly) that because of a previously filed grievance against Montes, United should have been aware of his harassment propensity before May 5, 1993, and it should therefore have taken action against Montes to stop him from harassing Rushing. In December 1992 Jeff Kuta ("Kuta") had filed a grievance against Montes, charging that Montes "create[d] an unreasonable work environment by intimidation with his use of abusive and offensive language" (P.Mem.Ex. C). In response Lampe found that Montes' language was "unacceptable" and therefore "issued a strong reprimand" (*id.* at 3). Walther corroborated that he had heard Montes use profanity from time to time in fits of anger (Walther Dep. 57–58), and as previously stated Montes himself concedes that he uses profanity with his friends (Montes Dep. 33, 74). Rushing contends that the Kuta grievance and Montes' reputation should have put United on notice that it had a problem on its hands.

But those things show only that United knew of Montes' propensity to use coarse language. Nothing about Kuta's grievance or Montes' reputation could have tipped United off that Montes had the potential to be a sexual harasser. Vulgar language and emotional outbursts are one thing, but sexual harassment is quite another. Even a quick glance at the Kuta grievance reveals that while it is rife with references to Montes' profanity, nothing about it hints that Montes was harassing Kuta sexually. It should be emphasized that in his 31 years at United, Montes has had only one sexual harassment claim against him—the one filed by Rushing.

In sum, United did not know—and it had no reason to know—of Montes' asserted propensity for sexual harassment before May 5, 1993. As soon as it was put on notice of that problem, United took prompt and reasonable steps that remedied the situation. Accord-

---

VII does not impose on an employer the obligation to divine potential sexual harassment problems. And as this opinion goes on to conclude, United had no reason to know before May 5, 1993 that corrective action needed to be taken against Montes.

**14.** Although defendants do not identify the exact date when Montes was transferred, Rushing has submitted nothing to indicate that the transfer did not take place about June 3, 1993, when Lampe issued his written response to the grievance. Indeed, that is a common sense reading of Lampe Aff. ¶¶ 13–14.

ingly Rushing's hostile environment theory fails.

*Quid Pro Quo*

▮ *Dockter*, 913 F.2d at 461, citing *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1413 (10th Cir.1987), defines quid pro quo sexual harassment:

> This type of sexual harassment describes situations in which submission to sexual demands is made a condition of tangible employment benefits.

But the Title VII case law requires more than a demand or even a threat of that nature—for the employee's claim to be actionable, he or she must have suffered damages: Some adverse job consequence must actually have resulted from the employee's refusal to submit to the requested conduct (see *id.* at 461).[15]  In other words, the employee must be tangibly worse off because of his or her refusal to succumb than he or she would have been had the supervisor's request for sex never been made.  Rushing's quid pro quo theory cannot succeed because, as the ensuing discussion shows, Rushing did not suffer any adverse employment consequences.[16]

It is uncontroverted that Montes is not in a position to hire, fire, promote or demote Rushing (Montes Dep. 162; Lampe Aff. ¶ 4).  Thus the classic form of leverage alleged in quid pro quo harassment cases is not present here—Montes simply was not in a position to say "Either submit to my sexual demands or _____" (fill in the blank with "I'll fire you," "I won't promote you," "I'll demote you" or

what have you).  All Rushing can contend is that (Complaint ¶ 16):

> Plaintiff LEON RUSHING remained unassigned, received unfavorable work assignments, and received harassment from defendant MONTES due to Plaintiff's refusals to satisfy Defendant MONTES' oral sex demands.

What Rushing's quid pro quo claim really boils down to is his assertion that after he refused Montes' requests for oral sex, Montes assigned him to less desirable jobs and persuaded other supervisors to single Rushing out for discipline.

As for the doling out of job assignments, Rushing says that after he rejected Montes' sexual overtures, he received a higher percentage of "crappy" job assignments (Rushing Dep. 73–75, 162–63).  He also puts much weight on Montes' admission that a supervisor with "malintent" could take his wrath out on an employee via job assignments (Montes Dep. 53).  Rushing does not claim, however, that Montes ever asked him to perform a job assignment that was not within the parameters of the union agreement.  Because the job assignments that can be passed out to ramp servicemen are dictated by the CBA, and because Rushing concedes that Montes never gave Rushing any job assignments outside of those specified in the CBA, Rushing cannot be heard to argue persuasively that he suffered any adverse employment consequences.

Put another way, Rushing was given no worse job assignments after his denial of Montes' requests than he could have been

---

**15.**  This is not to say that Title VII may not come into play at all if a manager requests sex in exchange for job benefits, but no adverse job consequences occur.  In that situation the very request could be evidence of a hostile environment.  But again the existence of such an environment alone does not trigger liability—the adverse consequence of a demotion, a refusal to promote, a firing (or its equivalent, a quitting amounting to a constructive discharge) or some other type of harm must also have befallen the employee.

**16.**  There is also a question whether United's swift and reasonable response when it learned of Montes' claimed misconduct would insulate it from liability on this claim as well—our Court of Appeals has not concluded whether an employer can be held strictly liable for quid pro quo sexual

harassment committed by a low-level supervisor (*Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 431–32 (7th Cir.1995)) (citations omitted):

> An employer is not strictly liable for sexual harassment of one employee by another unless, perhaps, the harassment takes the form . . . of an abuse of authority, as where a supervisor threatens to fire a subordinate if she refuses to have sex with him.  In such cases, a number of courts treat the supervisor *as* the employer, whether correctly or not we need not decide.

See also *Ellerth v. Burlington Indus. Inc.*, 912 F.Supp. 1101, 1121–23 (N.D.Ill.1996), which discusses the issue at some length.  This Court need not reach out to decide that issue either, again because of the absence of any adverse employment consequence to Rushing.

given before Montes made the requests. This is not a case of a person in a job with open-ended responsibilities who, after rejecting an employer's overtures, suddenly finds himself or herself with radically diminished responsibilities (see *Dockter*, 913 F.2d at 462). Here the permissible job assignments were spelled out by the CBA, and both before and after Rushing rejected Montes' requests for oral sex Rushing was asked to perform only jobs that were defined in the CBA. Just as in *Dockter* the employee's job description was found not to have been effectively altered, so here Rushing's was not either.

■ As for Rushing's second contention, he says that Montes engaged in a broad conspiracy with other supervisors to single Rushing out for discriminatory discipline.[17] But in support of that theory Rushing can point to only one disciplinary action imposed against him between the time that Montes made his requests for oral sex and the time that Rushing filed his grievance.[18] That happened on April 21, 1993 (the day before the meeting between Montes, Rushing and Walther), when Rushing was given a Level 1 discipline from supervisor Jerry Schroeder ("Schroeder") because of "9 absences for 19 days and 11 lates during the period of September 4, 1992 through April 8, 1993" (Lampe Aff. ¶ 20).[19]

Rushing contends that Montes was behind the imposition of that discipline, and that it was unfair because he was singled out for discipline when others were allowed to get away with the same things (Rushing Dep. 160). Other than abstract speculation that such a conspiracy of supervisors is possible (Walther Dep. 94–96), Rushing offers nothing to prop up the allegation that Montes was

behind Schroeder's disciplinary report (Rushing Dep. 38). It is also noteworthy that at the time Rushing did not find the Level 1 discipline problematic—he neither appealed it nor filed a grievance (Lampe Aff. ¶ 21). Moreover, Rushing admits that he was dependable only "off and on" (Rushing Dep. 18) and dedicated only "[w]hen I'm there" (*id.* 18). Taking into account that courts are not "to act as roving personnel departments" (*Cecilio v. Allstate Ins. Co.*, 908 F.Supp. 519, 529 (N.D.Ill.1995)) and the facial reasonableness of Schroeder's considering "9 absences for 19 days and 11 lates" over a seven-month period to be an unacceptable level of dependability, this Court cannot consider (even with favorable inferences) that the Level 1 discipline given to Rushing on April 21, 1993 evidences quid pro quo harassment.

That leaves Rushing's quid pro quo claim without support in the record. But he does muster another fuzzy argument, and this is as good a place as any to discuss it. Rushing also claims that Montes "used" two of Rushing's co-workers to try to persuade him not to pursue a grievance. Rushing says that each of Herman Curry ("Curry") and Brenda Johnson ("Johnson") approached him on different occasions and asked him not to press charges against Montes.

This Court had at first contemplated addressing that assertion, and the evidence relating to it, at some length. But on reflection this Court has decided otherwise, for in terms of a Title VII claim the simple answer is rather a question: "So what?" Rushing suffered no harm from any such efforts by supervisor Montes to resolve the charges without incident, efforts that contained no

---

17. Rushing must travel that more difficult conspiracy route because Montes himself never initiated disciplinary proceedings against Rushing (Rushing Dep. 38).

18. Discipline imposed after Rushing filed his grievance will be discussed in the *Retaliation* section.

19. Without having the documentation in front of him, Rushing testified that the April 21, 1993 Level 1 discipline was given for being out of the work area (Rushing Dep. 40) and that the June 26, 1993 discipline was given for "days off" (*id.*

41). Lampe's affidavit reverses the two dates, stating that the April 21 discipline was for absences and that the June 26 discipline was for being out of the work area (Lampe ¶¶ 20–21). That discrepancy does not affect the outcome of this motion—both incidents have been considered by this Court, and their sequence is irrelevant. This opinion will use Lampe's version of which incident occurred on which date, because with Rushing working only from memory and admittedly being confused (Rushing Dep. 41), it is more likely that Lampe's version is correct.

teeth if they were unsuccessful. That is simply not actionable.

In summary, Rushing has proffered nothing to support his allegations of quid pro quo harassment. His Title VII claims based on that theory also fail.

### Count II—Retaliation

■ *Dunning v. Simmons Airlines, Inc.,* 62 F.3d 863, 868–69 (7th Cir.1995) (citations omitted) defines the route to success on a retaliation claim:

> To make out a *prima facie* case of retaliation a plaintiff must establish that: "1) she engaged in statutorily-protected expression; 2) she suffered an adverse action by her employer; and 3) there is a causal link between the protected expression and the adverse action."

Just as in the quid pro quo area, the lack of an adverse job consequence is the fatal flaw in Rushing's retaliation claim. At worst Rushing points to his June 26, 1993 Level 2 discipline for "leaving the work area without permission" (Lampe Aff. ¶ 21).[20] But he admits that he was out of the work area on that date (Rushing Dep. 41), and he did not appeal or file a grievance regarding the June 26 imposition of discipline either. As with his April 21 discipline for unacceptable dependability, Rushing cannot fairly cry "adverse job consequence" for discipline that he essentially admits to be justified.

Rushing's second retaliation argument is even weaker. There he contends that the comments allegedly made by Lampe to Walther constitute "rumors" that in turn constitute retaliation. But once again there simply is no adverse job consequence involved. Was it unprofessional for Lampe to engage in such a discussion with Walther? Perhaps, though it is unnecessary to decide that. Even if such were the case, that does not make the "rumors" actionable under Title VII.

Because he has failed to show an adverse job consequence, Rushing's retaliation claim fails and must be dismissed. That marks the end of his federal-question claims.

### State Law Claims

This Court initially had jurisdiction over the state law claims under Section 1367(a), for those claims formed part of the same Article III case or controversy as the Title VII claims (something that defendants do not contest). But now that the Title VII claims are out of the picture Rushing's state law claims have no federal anchor, posing the question whether this Court should exercise or decline jurisdiction under Section 1367(c).

Defendants urge the latter choice, or urge alternatively that this Court should find the state law claims barred by the exclusivity provisions in both the Illinois Worker's Compensation Act and the Illinois Human Rights Act. Somewhat inexplicably, Rushing does not respond to those arguments in his memorandum, but instead argues only that his intentional infliction of emotional distress claim deserves to survive.

■ Whether this Court should exercise its discretion to retain jurisdiction over the state law claims depends on a weighing of several considerations: judicial economy, convenience, fairness and comity (*Timm v. Mead Corp.,* 32 F.3d 273, 276–77 (7th Cir. 1994)). When the state law claims involved are neither difficult nor unsettled, *Timm, id.* teaches that it is "entirely acceptable" to decide the state law claims even after dismissing all claims that provide the federal jurisdictional hook. Indeed, when it is so clear as a matter of state law that a claim can be decided in only one way, the district court ought to resolve it in the interest of judicial economy (*Brazinski v. Amoco Petroleum Additives Co.,* 6 F.3d 1176, 1182 (7th Cir.1993)).

### Negligent Supervision and Training; Ratification

■ That is certainly true of the negligent-supervision-and-training and "ratification" claims, because each is preempted by the exclusivity provisions of two different

---

**20.** Rushing complains that he went from a no-discipline record to Level 4 in a year, meaning that he had four items of discipline imposed upon him. But because Rushing fails to describe the last two discipline incidents, this opinion cannot and will not consider them.

Illinois statutes. This Court has already had occasion to discuss those issues (see *Jansen*, 895 F.Supp. at 1069–70), so this opinion will treat with those matters in relatively brief compass.

*Geise v. Phoenix Co. of Chicago*, 159 Ill.2d 507, 515–19, 203 Ill.Dec. 454, 457–59, 639 N.E.2d 1273, 1276–78 (1994) held that under the Illinois Human Rights Act (775 ILCS 5/2–102(D) and 5/2–101(E)(3)) allegations that are "inextricably linked" to the concept of sexual harassment must be construed as charging civil rights violations within the scope of that statute. Hence Illinois courts (and thus this Court sitting in a like capacity) are deprived of jurisdiction over private-party damage flowing from such conduct (775 ILCS 5/8–111(C)).

Although Rushing has not seen fit to respond on that issue, both the negligent-supervision-and-training claim and the ratification claim are certainly inextricably linked to his sexual harassment claims: They flow from the same set of facts and are nothing more than a backdoor attempt to get at United's deeper pockets. Accordingly this Court (like any Illinois court) lacks subject matter jurisdiction over those two state law claims.

Rushing also gets cut off at the pass by the Illinois Worker's Compensation Act (820 ILCS 305/1 to 305/30). Two provisions (*id.* 305/5(a) and 305/11) are pertinent:

> No common law or statutory right to recover damages from the employer ... for injury or death sustained by any employee while engaged in the line of his duty as such employee, other than the compensation herein provided, is available to any employee who is covered by the provisions of this Act....
>
> \* \* \* \* \* \*
>
> The compensation herein provided, together with the provisions of this Act, shall be the measure of the responsibility of any employer....

Illinois courts have consistently read those provisions as barring suits against employers for injuries intentionally inflicted by one employee on another (see *Jansen*, 895 F.Supp. at 1070 and cases cited there). Rushing has not attempted to argue the applicability of either of the exceptions to that general rule—(1) an employer's express authorization of the injurious conduct or (2) an assailant's status as the employer's alter ego. That's just as well, because the record surely would not support either argument.

As stated earlier, both the Illinois Human Rights Act and the Illinois Worker's Compensation Act have exclusivity provisions that deprive this Court of subject matter jurisdiction over Rushing's negligent-supervision-and-training and ratification claims. Both of those claims are dismissed with prejudice.

*Intentional Infliction of Emotional Distress*

■ That leaves only Rushing's intentional-infliction-of-emotional-distress claim, which targets Montes alone. Although *Geise*, 159 Ill.2d at 511, 203 Ill.Dec. at 455, 639 N.E.2d at 1274 signals that such a claim against an employee's actual employer (in this instance United) is preempted by the Human Rights Act (see this Court's opinion in *Al–Dabbagh v. Greenpeace, Inc.*, 873 F.Supp. 1105, 1114–14 (N.D.Ill.1994)), *Al–Dabbagh, id.* at 1415 reserved judgment as to whether such a claim was viable against the offending employee.[21]

This Court's colleagues have differed on that score—contrast the upholding of such individual-targeting claims in *Tolson v. HHL Fin. Servs., Inc.*, 1995 WL 461883 at \*4 (N.D.Ill. Aug. 3) and *Bustos v. Illinois Inst. of Cosmetology, Inc.*, 1994 WL 710830 at \*3–4 (N.D.Ill. Dec. 15) with the rejection of such claims in *Stahnke v. LMLM, Inc.*, 1996 WL 48610 at \*2 (N.D.Ill. Feb. 5) and *Schwitzenberg v. Lifeline, Ltd. of Ill.*, 1994 WL 684984, at \*6 (N.D.Ill. Dec. 6) (and most likely in the latter camp, see also *Lynam v. Foot First Podiatry Ctrs., P.C.*, 886 F.Supp. 1443, 1450 n. 7 (N.D.Ill.1995)). One clear conclusion emerges from that tangle of opinions: Illinois law is *not* clear in this area. It can scarcely be said that "difficult and unsettled state law issues are not implicated by the pendent claim[ ]" (*Timm*, 32 F.3d at 277). Thus whether or not the Human Rights Act

---

**21.** Unlike this case, *Al–Dabbagh, id.* "obviously lacked any element of *continued* harassment."

preempts Rushing's intentional infliction of emotional distress claim against Montes is a question best answered by a state court. That claim is dismissed without prejudice, and Rushing is free to reassert it in state court if he so desires.

*Conclusion*

This draws to a close this Court's involvement in this sordid affair. Defendants have met their burden of establishing that there is no genuine issue of material fact on Rushing's Title VII claims of sexual harassment and retaliation, so that defendants are entitled to a judgment as a matter of law. Those claims are dismissed with prejudice. Rushing's state law claims of (1) negligent supervision and training and (2) ratification are preempted by both the Illinois Worker's Compensation Act and the Illinois Human Rights Act, and they are dismissed with prejudice as well. Finally, Rushing's intentional infliction of emotional distress claim against Montes is dismissed without prejudice.

That leaves nothing pending before this Court. This action is dismissed in its entirety.

*Appendix*

GR 12(M) and 12(N) respectively require the submission of factual statements in support of and in opposition to Rule 56 motions. GR 12(N) states in pertinent part:

Each party opposing a motion filed pursuant to F.R.Civ.P. 56 shall serve and file—

\*   \*   \*   \*   \*   \*

(3) a concise response to the movant's statement that shall contain

(a) a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to affidavits, parts of the record, and other supporting materials relied upon, and

(b) a statement, consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment, including references to the affidavits, parts of the record, and other supporting material

replied upon. All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party.

Rushing's self-titled "Rule 12(N) Statement of Facts" is a narrative fact section that, while citing to the record, neither responds to each numbered paragraph in defendants' GR 12(M) statement (as GR 12(N)(3)(a) requires) nor cites additional facts in "short numbered paragraphs" (as required by GR 12(N)(3)(b)). Nonetheless, with some effort this Court was able to cull from Rushing's offerings the information necessary to rule on the current motion.

Suffice it to say that it would be in the best interest of Rushing's counsel to be more careful in following GR 12(N) in the future. Most courts (including this one when the facts are not as straightforward as those here) are disinclined to look the other way on such a clear violation of the rule (see, e.g., *Flaherty v. Gas Research Inst.*, 31 F.3d 451, 453 (7th Cir.1994)).