**Michelle BAZILE and Michael McGinnis, Plaintiffs,**

v.

**FORD MOTOR COMPANY, Defendant.**

No. 95 C 7101.

United States District Court,
N.D. Illinois.

April 22, 1997.

Michael H. Cole, Chicago, Ill., for plaintiff.

Lawrence M. Cohen, Davi Lynn Hirsch, Fox and Grove, chartered, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

ASPEN, Chief Judge:

Plaintiffs Michelle Bazile and Michael McGinnis bring this action against their former employer, Ford Motor Company, alleging that the defendant violated various employment discrimination provisions of Title VII, 42 U.S.C. § 2000e *et seq.*[1] Specifically, Bazile alleges that a Ford supervisor sexually harassed her and that she was retaliated against when she attempted to complain, while McGinnis alleges that he was passed over for higher-level assignments based on his gender and was also retaliated against when he tried to complain. Presently before this court is Ford's motion for summary judgment on all claims. For the reasons stated below, we grant the motion.

## I. Background

Prior to their discharge in November 1994, Bazile and McGinnis worked in the Paint Department of Ford's Chicago Assembly Plant. The plaintiffs were assigned to the body sealer assembly line, Bazile as a "paint assembler" and McGinnis as a "General Utility" person. Def.'s 12(M) ¶¶ 4, 8.[2] Bazile and McGinnis worked the second shift, which starts at 5:06 p.m. and ends at 3:33 a.m. Taking Bazile's claims first, she contends that the assembly line work imposed difficult demands on women generally because rest-room breaks were infrequently available, *see* Pls.' 12(N)(3)(b) ¶ 7, and on her especially because of health problems, *id.* ¶ 5. Formal breaks in the shift are provided for in a collective bargaining agreement, but outside of the scheduled breaks, line employees were required to ask the supervisor, known as the "Upgrade," for restroom relief. Def.'s 12(M) ¶¶ 11–13. The Upgrade is a jack-of-all-trades who, among other things, ensures that the assembly line operates smoothly by covering assignments for employees who must leave the line. *Id.* ¶ 13. If the Upgrade can cover for an employee seeking unscheduled restroom relief, and the Upgrade grants permission, then the employee may go to the restroom. *Id.*

Bazile maintains that the upgrade for whom she worked, Junior Guy, sexually harassed her by stating one day, in response to her request for restroom relief, that "he was sick and tired of bitches asking him to go to the bathroom because none of them were giving him ... 'any pussy.'" Bazile Dep. at 194. Bazile waited until the scheduled meal break to use the restroom. On the same day, as she walked by Guy on her way to the meal break, Guy said that "he was not letting these women go to the bathroom for nothing." *Id.* at 196. Apparently, these statements were made approximately two weeks before her discharge in mid-November 1994. *See id.* at 174. According to Bazile, these statements constitute both quid pro quo and hostile working environment sexual harassment.

As for McGinnis, he alleges that the sealer line supervisor, Tyron Ellington, favored women when selecting an employee to substitute for Guy during the Upgrade's temporary absences. According to McGinnis, it was plant practice to assign the General Utility person with the most seniority to substitute for the Upgrade. Pl.'s 12(N)(3)(b) ¶ 19.

1. On February 28, 1997, this action was reassigned to the calendar of this court from another judge.

2. Under General Rule 1 2(M) of the United States District Court for the Northern District Court of Illinois, a party moving for summary judgment must submit "a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to judgment as a matter of law." The nonmovant must then specifically respond to each of the movant's factual assertions, and include, "in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." Local Rule 12(N)(3)(a). The facts asserted in the movant's 12(M) Statement will be deemed admitted if the non-movant's responses do not contain citations to specific portions of the record supporting the contrary position. *Skagen v. Sears, Roebuck & Co.*, 910 F.2d 1498, 1500 (7th Cir.1990). In addition, under Local Rule 12(N)(3)(b), the non-movant may submit a statement of additional facts that the nonmovant contends require denial of the motion, and Local Rule 12(M) provides that the movant may likewise respond to the 12(N)(3)(b) statement.

However, the plaintiff contends, Ellington passed over McGinnis for Upgrade substitution assignments and instead appointed two less-senior women, Carmeshia Tillman and Denise Townsend, because of their gender. *Id.* ¶¶ 21–22. Accordingly, McGinnis brought this gender discrimination claim against Ford.

In addition to Bazile's sexual harassment claims and McGinnis's gender discrimination claim, both plaintiffs bring a retaliation claim. On November 16, 1994, approximately 14–17 employees gathered at the Union's office before the second shift's 5:06 p.m. start. One of the plant's Union representatives told the group to speak to the Labor Relations Office. Def.'s 12(M) ¶ 47. According to Bazile, it was approximately 4:50 p.m. when the group arrived at Labor Relations; by McGinnis' account, it was around 4:45 p.m. Def.'s Reply to 12(N) ¶ 48. Several employees in the group informed the others that the shift was about to start, and went to their assigned positions on the assembly line. Def.'s 12(M) ¶ 49. Some other employees returned to the Union office and asked whether they could get "in trouble" for missing the shift's start. *Id.* ¶ 50. These employees were told that "trouble" was possible, so they told the rest of the group and went to the line. *Id.* Some employees remained at the Labor Relations Office, which consists of a reception area and the private offices of Labor Relations Representative Louis Lafayette and Labor Relations Supervisor Jerry Schoonmaker.

After Lafayette came out of his office and saw the group, he told the employees to have a seat and said he would speak to them one at a time. Pls.' 12(N)(3)(b) ¶ 36. While Lafayette was meeting with one of the employees, Schoonmaker came out of his office and noticed the group of employees. Def.'s 12(M) ¶ 54. Schoonmaker asked why they were gathered there, and an employee responded that they were waiting to see Lafayette. *Id.* Schoonmaker then told the employees that "they had better report to the line before it starts." *Id.* The employees, including Bazile and McGinnis, did not leave. *Id.* ¶ 55. After Schoonmaker returned to his office, he phoned the Paint Department and

learned that the line had been unable to start without the employees. *Id.* ¶ 57. Schoonmaker then spoke with the employees again, telling them to go to work or else risk a work stoppage charge. *Id.* ¶ 58. The group again responded that Lafayette had told them to wait. Pls.' 12(N) ¶ 60. Schoonmaker entered Lafayette's office to inform him that the Paint Department line could not start without the employees and that the group would not leave unless they spoke with Lafayette. Def.'s 12(M) ¶ 61. After Lafayette ordered the group to go to the line, they left and reached the line at least 12 minutes after the shift's start, causing a production loss of 18 cars. *Id.* ¶¶ 61, 63.

On the next day, November 17, Schoonmaker terminated the nine employees who did not report to the line at the start of the shift, including the plaintiffs. *Id.* ¶ 68. After the Union filed grievances on behalf of the employees, the nine employees were offered reinstatement without loss of seniority conditioned on their agreement that they enter into a 12–month probationary period. *Id.* ¶ 73. Only Bazile and McGinnis refused to settle, and eventually brought this action against Ford. In the four-count complaint, Bazile alleges that she endured a hostile work environment and was subjected to quid pro quo sexual harassment (Counts 1 and 2); McGinnis alleges gender discrimination in the selection of temporary Upgrades (Count 3); and both plaintiffs allege that Ford retaliated against them for asserting their statutorily-protected rights (Count 4). We now turn to Ford's motion for summary judgment.

## II. Standard for Reviewing Motions for Summary Judgment

Under the Federal Rules of Civil Procedure, summary judgment is appropriate if "there is no genuine issue as to any material fact, and .... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The movant bears the initial burden to identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323,

106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)). Material facts are those determinative of the outcome of an issue as determined by the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Once the movant has done this, the nonmovant "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). In deciding a motion for summary judgment, the court must read all facts in the light most favorable to the non-moving party, *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513–14, and refrain from making credibility determinations, *Jackson v. Duckworth*, 955 F.2d 21, 22 (7th Cir.1992).

## III. Discussion

### A. Hostile Work Environment (Count 1)

Title VII's prohibition against gender discrimination is violated "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult[ ]' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' " *Harris v. Forklift Sys.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993) (quoting *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 65, 67, 106 S.Ct. 2399, 2404–05, 2405–06, 91 L.Ed.2d 49 (1986)). In determining whether an environment is sufficiently hostile to violate Title VII, we examine all the pertinent circumstances, including:

> the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

*Harris*, 510 U.S. at 23, 114 S.Ct. at 371. Additionally, the environment must be sufficiently hostile as viewed by a reasonable person (an objective inquiry) as well as by the individual plaintiff (a subjective inquiry).

*Saxton v. American Tel. & Tel. Co.*, 10 F.3d 526, 534 (7th Cir.1993).

■ In response to Ford's motion, Bazile simply states that her "claim of hostile work environment consists of the vulgar, quid pro quo, comments of Junior Guy *and* the general atmosphere she and other women were required to work in." Ps.' Resp. at 11 (emphasis in original). As reported by Bazile, Guy's suggestive comments were no doubt offensive, but Bazile was able to use the restroom that day on her meal break, Guy made the comments once and during one day, and there is no evidence Guy ever attempted to physically touch her. Def.'s 12(M) ¶¶ 22, 24, 26. As for the "general atmosphere" to which Bazile refers, her own factual portrayal of the plant's practice of restricting extra restroom relief fails to show that the restrictions were applied differently based on gender. *See* Pl.'s 12(N)(3)(b) ¶¶ 10, 12, 14.[3] Moreover, Bazile does not discuss or ground her claim on a disparate impact theory, nor does she have any evidence that the infrequent availability of extra relief had any such disproportionate effect on women. In light of the relevant factors, we conclude that no reasonable trier of fact could find that the conditions experienced by Bazile were sufficiently severe and pervasive so as to comprise a hostile work environment. *See Weiss v. Coca–Cola Bottling Co.*, 990 F.2d 333, 337 (7th Cir.1993) (insufficiently severe and pervasive where one of plaintiff's supervisors asked her for dates, called her a "dumb blond," put his hand on her shoulder at least six times, placed "I love you" signs in her workplace, and tried to kiss her at least once); *Koelsch v. Beltone Elecs. Corp.*, 46 F.3d 705, 708 (7th Cir.1995) (insufficient where company president stroked employee's leg with his foot, grabbed her buttocks, and made other unwanted sexual advances); *Saxton*, 10 F.3d at 534–35 (insufficient where

---

**3.** Indeed, Bazile points to only one gender-based aspect of the environment, specifically, that supervisor Tyron Ellington kept a log of the "women" who went on extra restroom breaks. Pl.'s 12(N)(3)(b) ¶ 8. However, she bases this assertion on a passing statement in Cecil Waldron's deposition testimony, which refers to Ellington's log *without* limiting the log to women. *Id.* (citing

Waldron Dep. at 36). Furthermore, Ellington avers in an affidavit that he logged both men and women who asked for extra relief, and proffers the log as an exhibit to his affidavit. Ellington Aff. ¶ 5, Ex. A. Based on the evidence provided by the parties, no reasonable trier of fact could find that Ellington tracked only women in the log.

supervisor suggestively touched employee and kissed her).

### B. Quid Pro Quo (Count 2)

■ To prevail on her claim of quid pro quo harassment, Bazile must eventually prove that: (1) Guy "made submission to sexual demands a condition of tangible employment benefits," *Dockter v. Rudolf Wolff Futures, Inc.,* 913 F.2d 456, 461 (7th Cir. 1990); and (2) she experienced some tangible detriment as a result of her refusal to comply with Guy's demands, *id.; Gary v. Long,* 59 F.3d 1391, 1395–96 (D.C.Cir.) (collecting cases), *cert. denied,* —— U.S. ——, 116 S.Ct. 569, 133 L.Ed.2d 493 (1995); *Rushing v. United Airlines,* 919 F.Supp. 1101, 1109 (N.D.Ill.1996). Although Ford argues that Guy's comments were not directed at Bazile specifically, her account of the statements and the circumstances, Pls.' 12(N) ¶¶ 21–22, when viewed in her favor, raise a genuine factual issue with respect to whether Guy made sexual demands upon her.

However, whether some "tangible" aspect of Bazile's employment was affected is another question. "A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Crady v. Liberty Nat. Bank and Trust Co.,* 993 F.2d 132, 135–36 (7th Cir. 1993).[4] While it is true that "a wide variety of actions, some blatant and some subtle, can qualify," *Bryson v. Chicago State Univ.,* 96 F.3d 912, 916 (7th Cir.1996), a "mere inconvenience" will not suffice, *Crady,* 993 F.2d at 136, nor will a "minor change in working conditions," *Williams v. Bristol–Myers Squibb Co.,* 85 F.3d 270, 274 (7th Cir.1996).

*See also Rabinovitz v. Pena,* 89 F.3d 482, 488–89 (7th Cir.1996) (adverse performance review, resulting only at most in loss of $600 bonus, not adverse employment action if employee not automatically entitled to bonus).

Bazile fails to proffer sufficient evidence showing that a tangible employment benefit was denied so as to make out a claim for discrimination in the "terms, conditions, or privileges" of her employment. § 2000e–2(a)(1). First, we point out that her only response to Ford's argument that she suffered no tangible harm is an unsupported assertion that she suffered a urinary tract infection due to her refusal to submit to Guy's one-day demand. The deposition testimony upon which she relies does not actually discuss the cause of the infection, Pls.' 12(N)(3)(b) ¶ 13 (citing Bazile Dep. at 219), and the only expert testimony in the record—from her own doctor—denies that waiting to use the restroom caused the infection, Def.'s Reply to 12(N)(3)(b) ¶ 13 (citing Lassiter Dep. at 40, 64). Moreover, Bazile does not point to any evidence suggesting that she was denied unscheduled relief after that one day, or that Guy ever made the demand again. Def.'s 12(M) ¶¶ 22, 24. Nor does Bazile refute that, on the day of the quid pro quo demand, she was able to continue performing her job, wait until the meal break, and use the restroom then. *Id.* ¶ 22. At bottom, the only adverse action supported by evidence is the denial of one unscheduled restroom break that delayed Bazile's use of the restroom until the meal break without affecting her performance. Given that minor changes in working conditions and mere inconveniences are insufficient to qualify as adverse employment actions, we hold that no reasonable trier of fact could find for Bazile

---

4. Although *Crady* discusses the question of adverse employment action in an Age Discrimination in Employment Act case, the Seventh Circuit has turned to such cases, as well as retaliation cases, for guidance on the "tangible employment benefit" question in quid pro quo cases. *See Bryson v. Chicago State Univ.,* 96 F.3d 912, 916 (7th Cir.1996) (quid pro quo case citing to retaliation case, *Smart v. Ball State Univ.,* 89 F.3d 437, 441 (7th Cir.1996), which cites to *Crady* ). In the instant case, we need not attempt to distinguish between the types of cases because any distinction would make no difference in light out of our conclusion. *Cf. McDonnell v. Cisneros,* 84 F.3d 256, 258–59 (7th Cir.1996) (explaining that if there is any difference between the adverse employment action required in retaliation and discrimination cases, *compare* § 2000–e3(a) *with* § 2000–e2(a)(1), (2), the retaliation provision covers a broader range of employment actions than the discrimination provision).

on her quid pro quo claim.[5]

### C. Gender Discrimination (Count 3)

■ Next, Ford contends that there is insufficient evidence to support McGinnis's claim that supervisor Tyron Ellington favored women over men for temporary Upgrade assignments. From McGinnis's scant discussion of this claim in his response brief, it is unclear whether McGinnis hopes to prove discrimination with direct evidence or instead use the *McDonnell–Douglas* prima facie method of proof:

> [McGinnis] was in the Labor Relations Office to discuss ... Tyron Ellington's placement of at least two women, who had less seniority th[a]n he, in the upgrade position instead of McGinnis. Ellington wanted females in those positions, including one, Carmeshia Tillman, because he was romantically involved with her.

Pls.' Resp. at 11. Regardless of the method of proof, the evidence presented by both the plaintiff and the defendant would not permit a reasonable trier of fact to find that Ellington discriminated against McGinnis on the basis of gender.

In McGinnis's factual presentation, it appears that the "two women" with less seniority mentioned in the brief are Caremshia Tillman and Denise Townsend. Pls.' 12(N) ¶ 38; Pls.' 12(N)(3)(b) ¶ 21. However, McGinnis fails to point us to any evidence as to the circumstances of Townsend's selection. With regard to Tillman, the plaintiff provides details as to only one specific instance when she allegedly displaced him. In early November 1994, Junior Guy went on a two-week vacation, and McGinnis was assigned the substitute Upgrade after he approached Ellington. However, after one day of substituting, Ellington assigned a *male* worker with more seniority, J.J. Goodlow, to replace

McGinnis. Although McGinnis does not remember why he was replaced, another employee named Bridgette Turner had complained about his performance. Def.'s 12(M) ¶ 41; Pls.' 12(N) ¶ 41. After that day, Ellington assigned Tillman as substitute Upgrade for the remainder of Guy's absence. Def.'s 12(M) ¶ 42.

McGinnis fails to explain why this episode constitutes evidence of discrimination. Although he testified that Ford's policy was to make substitute assignments on seniority, he also admitted that another male employee with less seniority was chosen over him, Def.'s Reply to 12(N) ¶ 38, and the defendant's decisionmakers testified that seniority was but one of several factors used in picking a substitute, Def.'s 12(M) ¶ 34. In addition, other males served as substitute Upgrades on a number of occasions, including Goodlow, Erick Willis, and McGinnis himself. Def.'s 12(M) ¶ 35; Def.'s Reply to 12(N) ¶ 38. Finally, to the extent McGinnis argues that Tillman's selection was based on her romantic relationship with Ellington, Pl.'s Resp. at 11,[6] his claim fails because an adverse employment action based on such a relationship may not form the basis for a gender discrimination claim. *DeCintio v. Westchester County Medical Center*, 807 F.2d 304, 307–08 (2d Cir.1986); *O'Patka v. Menasha Corp.*, 878 F.Supp. 1202, 1206–07 (E.D.Wis.1995) (citing EEOC Notice 91 5–048: "isolated instances" of sexual favoritism not prohibited); *see Piech v. Arthur Andersen & Co.*, 841 F.Supp. 825, 828–30 (N.D.Ill.1994). Accordingly, we grant summary judgment against McGinnis as to the gender discrimination claim.

### D. Retaliation (Count 4)

In order to establish a prima facie case of retaliation in violation of Title VII, the plaintiffs must show that 1) they engaged in a activity protected under Title VII; 2) they

---

**5.** We note that the plaintiffs' brief contains scant discussion regarding the principles by which to measure the putative adverse employment action. Pl.'s Resp. at 11 (citing, and not discussing, only one case, *Rushing v. United Airlines*, 919 F.Supp. 1101 (N.D.Ill.1996)).

**6.** We note that McGinnis does attempt to rely on a statement Ellington allegedly made when McGinnis confronted Ellington with an instance

where Tillman was assigned substitute Upgrade. According to McGinnis, Ellington told him, "I want a female to be my upgrade." Dep. McGinnis at 279. However, McGinnis concedes that Ellington was referring to Tillman, and thus this statement does not provide support that Ellington discriminated on the basis of gender rather than on the basis of the romantic relationship with Tillman.

then suffered an adverse employment action; and 3) there exists a causal connection between the adverse employment action and their participation in protected activity. *Koelsch v. Beltone Elecs. Corp.*, 46 F.3d 705, 708 (7th Cir.1995). If the plaintiffs establish a prima facie case, then the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the employment action. *Johnson v. University of Wisconsin–Eau Claire*, 70 F.3d 469, 479 (7th Cir.1995). If the employer rebuts the prima facie case, the plaintiffs must show that the articulated reason is pretextual. *Id.*

■ Even assuming that the plaintiffs in this case have established a prima facie case, Ford has articulated a legitimate, non-retaliatory reason for their termination. According to Ford, Labor Relations Supervisor Schoonmaker decided to terminate all nine employees who missed the start of the shift for engaging in a "work stoppage" prohibited by the collective bargaining agreement (CBA) as a terminable offense. Def.'s 12(M) ¶¶ 64–68. The CBA provides:

> The Union will not cause or permit its members to cause, nor will any member of the Union take part in, any sit-down, stay-in, or slowdown in any plant of the Company or any curtailment of work or restriction of production or interference with the operations of the Company.

Schoonmaker Aff. ¶ 15. After deciding that the employees who had remained in the Labor Relations Office had committed a work stoppage and should be terminated, Schoonmaker consulted with Paint Department manager Cecil Waldron, who agreed with Schoonmaker's conclusions. *Id.* ¶ 17.

In response, the plaintiffs proffer two arguments to show that the work stoppage reason is a pretext. First, the plaintiffs contend that the usual procedure for investigating an employee's tardiness was not followed, belying the truthfulness of the work stoppage reason. The plaintiffs point out that Tryon Ellington typically investigated the reason why employees were late before discipline was imposed, Pls.' 12(N)(3)(b) ¶ 27, and imply that Ellington did not follow that course in the instant case. However, the record before us shows that Ellington did indeed ask the employees why they were late for the shift, Def.'s Reply to 12(N)(3)(b) ¶ 27 (citing Ellington Dep. at 55–56), and the employees answered that "they were upstairs" in Labor Relations, Ellington Dep. at 56. Furthermore, the plaintiffs do not dispute that Schoonmaker was the pertinent decisionmaker with regards to their discharge, and they point to no evidence that casts doubt on Schoonmaker's investigative process.

Second, the plaintiffs maintain that they did not engage in a work stoppage as defined by the CBA, and thus Schoonmaker incorrectly interpreted the agreement. Specifically, the plaintiffs point to deposition testimony of various Ford managers defining work stoppages as deliberate attempts to stop production, akin to strikes. Pls.' Resp at 9 (citing Lafayette Dep. at 45, Wally Krantz Dep. at 42, and Waldron Dep. at 64). None of the testimony, however, is excerpted or presented pursuant to Local Rule 12(M), (N), and thus is not properly before us. Furthermore, even viewing the evidence in the plaintiffs' favor, it is undisputed that Schoonmaker warned the nine remaining employees that "they had better report to the line before it starts." Def.'s 12(M) ¶ 54. They refused to leave, and as a result, the shift did not start on time. Schoonmaker's belief that the sequence of events constituted "any curtailment of work," Schoonmaker Aff. ¶ 15 (quoting CBA), need not be correct, but only *honest.* Because the plaintiffs fail to advance any argument supported by evidence to doubt the honesty of Schoonmaker's proffered reason, we grant summary judgment on the retaliation claim as well.

## IV. Conclusion

For the reasons set forth above, we grant the defendant's motion for summary judgment on all claims. It is so ordered.