Betty **DOCKTER**, Plaintiff–Appellant,

v.

**RUDOLF WOLFF FUTURES, INC.,**
Defendant–Appellee.

No. 88–1988.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 21, 1989.
Decided Sept. 20, 1990.

Gregory X. Gorman, Robert J. Paul, H. Candace Gorman, Gorman & Gorman, Chicago, Ill., for plaintiff-appellant.

Matthew J. Iverson, Abramson & Fox, Jeffrey Goldwater, Querrey, Harrow, Gulanick & Kennedy, Chicago, Ill., for defendant-appellee.

Before WOOD, Jr., COFFEY, and KANNE, Circuit Judges.

KANNE, Circuit Judge.

For a period of nearly three months—from January 27, 1985 through April 22, 1985—Betty Dockter was employed by Rudolf Wolff Futures, Inc., a commodity brokerage firm engaged in buying and selling commodity futures contracts. After her termination from Rudolf Wolff, Dockter filed a "Charge of Discrimination" with the Equal Employment Opportunity Commission in which she alleged that she had been sexually harassed during her employment by her supervisor, James Gannon. After receiving a "Right to Sue Notice" from the EEOC, Dockter filed a complaint in the district court against Rudolf Wolff as the sole defendant. In her complaint, Ms. Dockter alleged that James Gannon's conduct towards her amounted to sexual harassment actionable under Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U.S.C. §§ 2000e *et seq.* She also brought a pendent state law battery claim under Illinois common law.

A bench trial was conducted on the issues raised by Dockter's complaint. At the conclusion of those proceedings, the district court found in favor of the employer, Ru-

dolf Wolff, on both counts.[1] The district court found as a matter of fact that many of the sexual overtures and acts which Ms. Dockter alleged did occur. Notwithstanding this factual foundation, however, the court held that those acts did not rise to a level of conduct actionable under Title VII. 684 F.Supp. 532. In this appeal, Dockter argues that the evidence presented at trial was sufficient to sustain a claim of sexual harassment under both a hostile environment and *quid pro quo* theory. She also argues that Rudolf Wolff, as the employer of James Gannon, is liable for his sexual harassment. We affirm the district court's decision.

## I.

On the basis of the district court's findings of fact, the following represents the situation regarding Ms. Dockter's relationship with her supervisor, James Gannon, during her tenure with Rudolf Wolff.

Gannon met Ms. Dockter in November of 1984 at the Chicago Bar & Grill. She was a bartender at that establishment and Gannon was a frequent patron. As a result of the relationship which Gannon developed with Ms. Dockter in this setting, and in the hopes of further developing that relationship in the future, Gannon asked Ms. Dockter to come work for Rudolf Wolff.[2] As a manager of the sales force at one of Rudolf Wolff's two Chicago offices, Mr. Gannon was in a position to make this offer. In their discussion of this employment opportunity, Ms. Dockter told Gannon that she had graduated from high school, that she knew how to type, and that she would be willing to learn how to use the company's word processing machines. The fact of the matter, however, was that Ms. Dockter had only a ninth grade education and was not proficient in typing. Nevertheless, she accepted the job-offer and was hired by Gannon at a salary of $25,000 per year to serve as his "administrative assistant." As testi-

fied to by Gannon, Ms. Dockter's responsibilities were to include the organization of the office and various functions in the marketing end of the business. If not apparent to her at the outset, Ms. Dockter came to realize shortly after she began her new employment that Gannon's interest in her was not merely work-related. After an initial two-week period, during which Mr. Gannon made a number of sexual advances towards her (all of which were rejected), Ms. Dockter continued as an employee of Rudolf Wolff for approximately nine weeks until her position was terminated. The termination of Ms. Dockter, based on her attitude and inability to carry out the tasks assigned, was carried out by Gannon's co-managers, Richmond Flowers and Steve Barnard—a decision in which Gannon ultimately concurred.

## II.

Title VII of the Civil Rights Act of 1964 provides that it is an "unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin...." 42 U.S.C. § 2000e–2(a)(1). Such harassment may be of the "hostile work environment" variety or the *quid pro quo* variety. *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986). Ms. Dockter feels that she was the victim of both types of sexual harassment during her term of employment at Rudolf Wolff. We will address each in turn.

### A. *Hostile Work Environment Sexual Harassment*

The dismissal of Ms. Dockter's Title VII allegations was premised, in part,

---

1. Dockter has not appealed the trial court's judgment in favor of Wolff on the Illinois state law battery claim.

2. The entity for which Mr. Gannon worked at this time, and that into which Ms. Dockter was

hired, was Refco, Inc. At some point in February of 1985, Refco was bought out by Rudolf Wolff. The precise date of the "buy-out" was not revealed by the parties during the course of the bench trial.

on the district court's conclusion that Gannon's sexual improprieties, as testified to by Ms. Dockter and two of her female co-employees, did not rise to the level of a "hostile work environment" as that term is understood under Title VII jurisprudence. In this context, a "hostile work environment" arises when the alleged sexual harassment " 'has the purpose or effect of ... creating an intimidating, hostile, or offensive work environment.' " *Meritor*, 477 U.S. at 65, 106 S.Ct. at 2404–05 (quoting 29 C.F.R. § 1604.11(a)(3)); *Brooms v. Regal Tube Co.*, 881 F.2d 412, 418 (7th Cir.1989). For such sexual conduct to be actionable, "it must be sufficiently severe or pervasive 'to alter the terms or conditions of [the victim's] employment and create an abusive working environment.' " *Meritor*, 477 U.S. at 67, 106 S.Ct. at 2405 (quoting *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir.1982)). Finally, in determining whether the allegations of sexual harassment rise to this level, we have stated that a district court should employ both an objective and subjective analysis "considering the likely effect of a defendant's conduct upon a reasonable person's ability to perform his or her work and upon his or her well-being, as well as the actual effect upon the particular plaintiff bringing the claim." *Brooms*, 881 F.2d at 419.

In dismissing Ms. Dockter's "hostile work environment" claim, the district court made the following findings regarding Gannon's motivations in hiring Ms. Dockter and his conduct towards her and other female employees at Rudolf Wolff.

Addressing Gannon's motivations in hiring Ms. Dockter, the district court stated, "In early 1985, James [Gannon] was seeking an administrative assistant and, *in an effort to impress Plaintiff and secure her company in the future*, he offered her the job at a salary level far in excess of what she was then making, or was likely to make in the foreseeable future, $25,000 per annum." (emphasis added). After hiring Ms. Dockter, the stage was set for Gannon to put on his "show." His conduct from the

outset of Ms. Dockter's employment was described by the district court as follows:

For the first few weeks, James, as he occasionally did with other female employees at the office, made sexual overtures to—in the vernacular of the modern generation, "came on to"—her. Although Plaintiff rejected these efforts, her initial rejections were neither unpleasant nor unambiguous, and gave James no reason to believe that his moves were unwelcome.

By the end of her third week with Wolff, James began to realize that his preening, primping and posturing ... were no longer desired. After one misguided act, in which he briefly fondled Plaintiff's breast and was reprimanded by her for doing so, he accepted his defeat and terminated all such conduct.

This is only a "general" description of Gannon's conduct. The specifics of that conduct, testified to by Ms. Dockter and other female employees at Rudolf Wolff, reveal the following.

According to Ms. Dockter, Gannon asked her on her first day with Rudolf Wolff to join him for lunch for the express purpose of meeting a client named Steve Barnard. In actuality, Mr. Barnard was not a client. Rather, he was a long-time friend of Gannon's whom Gannon wished to recruit to come work for Refco, which later became Rudolf Wolff.[3] Ms. Dockter testified that she and Gannon arrived before Mr. Barnard and were seated at a booth for four. Rather than sitting on the opposite side of the booth, Gannon insisted on sitting on Ms. Dockter's side of the booth while they waited for Mr. Barnard to arrive. Ms. Dockter testified that Gannon did not attempt to touch her in a sexual manner on this occasion. He did, however, ask her about her plans for that evening after their meeting with Mr. Barnard was over. Indeed, Ms. Dockter testified that even after she told him that she had already arranged to meet her roommate, Gannon insisted on walking her to her roommate's office. Pamela Snyder, Ms. Dockter's roommate, corroborated Dockter's testimony and add-

**3.** Barnard did, in fact, become a co-manager at Rudolf Wolff.

ed that Gannon offered her a job upon meeting her that evening.

Ms. Dockter was also subjected to a number of incidents of sexual attention in the work place itself. She testified that Gannon would enter her office, shut and lock the door, sit opposite her and just stare at her. She also testified that Gannon played with her hair on several occasions. When asked to stop, he would say things like "you have a piece of lint in your hair." According to Ms. Dockter, on one occasion while she was bent over getting the mailings, Gannon came up from behind her, grabbed her waist and said "I could drive you crazy." She further testified that Gannon frequently called her at her home during her first two weeks requesting that she meet him at the East Bank Club and other places. The testimony of the other female employees corroborates some of Ms. Dockter's assertions and indicates that they too were subjected to substantially the same treatment.[4]

The final instance of sexual misconduct testified to by Ms. Dockter occurred at the end of her second week of work. According to Ms. Dockter, Gannon asked her to accompany him to Carlucci's Restaurant after work for the purpose of meeting some clients. Prior to going to the restaurant, Ms. Dockter went with Gannon to his apartment where he changed clothes. When they arrived at the restaurant, Gannon again insisted on sitting on the same side of the booth as Ms. Dockter while waiting for the clients—who never arrived. During the wait, Gannon grabbed Ms. Dockter and attempted to kiss her several times. Finally, she asked him to take her home which he did. Gannon apologized, but when they got to her apartment building, he again attempted to kiss Ms. Dockter. This time he also fondled her breast. Ms. Dockter was very upset, got out of the car, and went into her apartment building. While she was waiting for the elevator, Gannon apologized once more saying, "I'm really sorry, I'm really sorry. Let's just forget this happened."

Aside from her rebuff of Gannon, Ms. Dockter did not complain about this conduct to anyone at the management level of Rudolf Wolff. She testified that she did not want to lose her job. She did not explain, however, why she did not complain to Gannon's immediate supervisor, Ms. Nancy Johnson, a vice president of Rudolf Wolff whose office was only a few blocks away.

Based on this intimidating and offensive conduct which the district court inferentially adopted as fact, it would appear that Ms. Dockter's work environment during these initial two weeks was "hostile" such as to be actionable under Title VII. However, regardless of our view that Gannon's offensive conduct created a hostile work environment, Ms. Dockter has not alleged or proven an injury resulting from this conduct which can be remedied under the equitable provisions of Title VII.[5]

---

4. Laura Lopez Riojas and Lauren Rosenburg, two female employees of Rudolf Wolff during this period, were called by Ms. Dockter to testify at trial. Ms. Riojas, who was employed as a receptionist, testified that on one occasion she saw Gannon playing with Ms. Dockter's hair. She also stated that she saw Gannon go into Ms. Dockter's office on numerous occasions. On these occasions she knew the door was locked because she heard other males in the office joking about the fact that Gannon had again locked himself in Ms. Dockter's office. Ms. Riojas' testimony was not limited to allegations of sexual harassment towards Ms. Dockter, however. According to Ms. Riojas, there was one occasion when Gannon asked her to come into his office. She testified that she was scared to go into his office because "he was always either patting my butt or he would play with my hair...." Nevertheless, she went into his of-fice. According to Ms. Riojas' testimony, Gannon asked her to sit on his lap on this occasion and, when she did so, whispered things into her ear. She immediately left his office.

Ms. Rosenburg worked for five months as an Account Executive for Rudolf Wolff. She testified that Gannon called her at home on a number of occasions to ask her out to dinner—and that she went to dinner with him one time. Ms. Rosenburg also testified that Gannon would attempt to hold her hand at work, but she found it flattering. Finally, Ms. Rosenburg did not believe that she had been sexually harassed by Gannon.

5. As purely a matter of interest and not a factor relevant to the disposition of this case, we note that Ms. Dockter obtained other employment immediately upon her termination by Wolff.

The record reveals (and Ms. Dockter does not dispute) that Gannon's "preening, primping and posturing" ended after he was reprimanded on the evening that he fondled her breast. Further, Ms. Dockter does not allege that she was subjected to similar offensive conduct after that date by other male employees at Rudolf Wolff. As such, even if her initial two-weeks were "hostile" such as to be actionable under Title VII, in the absence of any continuing sexual harassment or discharge based on that sexual harassment, Ms. Dockter cannot obtain relief under Title VII. As the statutory language indicates, the remedial provisions of Title VII are limited to "equitable relief" and do not contemplate an award of compensatory, nominal, or punitive damages. *King v. Board of Regents of Univ. of Wisconsin System,* 898 F.2d 533, 537 (7th Cir.1990); *Bohen v. City of East Chicago,* 799 F.2d 1180, 1184 (7th Cir.1986).[6] Because the sexual harassment about which Ms. Dockter complains had long-since ceased at the time of her termination and because her termination was not the result of sexually discriminatory motives, the decision in favor of Rudolf Wolff on Ms. Dockter's "hostile work environment" claim was correct, albeit for reasons other than those stated by the district court.

## B. Quid pro Quo *Sexual Harassment*

■ As was the district court, we are left with Ms. Dockter's allegations of *quid pro quo* sexual harassment. This type of sexual harassment describes situations in which submission to sexual demands is made a condition of tangible employment benefits. *Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1413 (10th Cir.1987); *see also* 29 C.F.R. § 1604.11(a) ("Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when

... submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, ...").

Ms. Dockter alleged at trial that she was the victim of *quid pro quo* sexual harassment. Specifically, she argued that the terms and conditions of her employment were altered due to her rejection of Gannon's sexual demands and, ultimately, that her rejection of his sexual overtures led to her termination. According to Ms. Dockter, her employment with Rudolf Wolff was induced, in part, by promises made by Gannon of work-related training which would include a Dale Carnegie course and a "Series Three" course.[7] Ms. Dockter testified, however, that after the incident at Carlucci's Restaurant her job responsibilities at Rudolf Wolff began to diminish to the point that she was relegated to doing mailings on an IBM personal computer and getting coffee. She further testified that she did not receive the training which Gannon had promised when he offered the job; training which, according to her, would have permitted her to develop into the position for which she had originally been hired.

■ Consistent with the overwhelming nature of the evidence presented at trial, the district court held that Ms. Dockter's termination was the result of her inability to become proficient as an operator of the IBM personal computer. This determination—one of "intent" under Title VII—is a factual determination subject to a clearly erroneous standard of review. *Anderson v. Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985); *Swanson v. Elmhurst Chrysler Plymouth, Inc.,* 882 F.2d 1235, 1237 (7th Cir. 1989). We find nothing in the record which would lead us to question this factual de-

---

**6.** 42 U.S.C. § 2000e–5(g) provides, in pertinent part:

  If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice ..., the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may

be appropriate, which may include, but is not limited to, reinstatement or hiring of employees ... or any other equitable relief as the court deems appropriate.

**7.** A Series Three course is a preparation course taken by one who wishes to take the test to become licensed to sell commodities.

termination, for even Ms. Dockter agrees that she was not proficient on the personal computer. Thus, we agree with the district court that Ms. Dockter's termination was not retaliatory under Title VII. This determination is buttressed by the fact that the termination of Ms. Dockter was first raised by co-manager, Mr. Barnard, recommended by the vice president, Ms. Johnson, and agreed to by co-manager, Mr. Flowers— over the initial objections of Mr. Gannon.

The question remains, however, whether Ms. Dockter's job responsibilities were diminished in any manner by Gannon after she rejected his overtures and, if they were, whether that diminishment was the proximate result of Gannon's displeasure at being so rejected. The district court did not address this aspect of Ms. Dockter's allegations. Our examination of the record reveals, however, that Ms. Dockter's actual job duties and responsibilities—that is, those duties which she actually performed—did not change from the period before Gannon's sexual overtures to after. The record also reveals that Ms. Dockter did receive training on the IBM personal computers and was enrolled in the Series Three and Dale Carnegie courses. In light of all of these facts, we need not address the issue of whether the alleged diminishment was retaliatory in nature or a *quid pro quo* for her rejection of Gannon's sexual advances.

Ms. Dockter was hired by Gannon as an administrative assistant with office manager duties and responsibilities. Initially we note that this "position" is never specifically defined in the record and, as such, it is unclear whether the actual responsibilities which Ms. Dockter assumed were different from those contemplated when she was hired. Notwithstanding this question, the fact remains that Ms. Dockter *never* functioned as an "office manager" at Rudolf Wolff during her term of employment there; not even prior to her rejection of Mr. Gannon's initial sexual advances. Her own testimony reveals that when she came to work at Rudolf Wolff there was really "nothing to do because we didn't have the [personal computer] hooked up then." In-

deed, she testified that the only job she performed at Rudolf Wolff during her three months of employment was to try to become proficient on the IBM personal computer—a job which she did not perform adequately. Based on these facts, it is apparent that Ms. Dockter's responsibilities at Rudolf Wolff were not *diminished* after she rejected Gannon's sexual overtures. To the contrary, it appears that Ms. Dockter's actual duties at Rudolf Wolff were unchanged from beginning to end.

Ms. Dockter also alleges that she was not given the training which Gannon promised. The facts reveal, however, that she was given training on the IBM personal computer by a Rudolf Wolff employee charged with providing that training. With regard to the Series Three course, it is undisputed that Rudolf Wolff paid for the course and that Ms. Dockter did begin this training, but was required to "drop out" because her schedule at work became too busy. In this regard, her schedule was not unique among the various employees at Rudolf Wolff; she testified that everybody had to work longer hours during this period. Thus, there is no indication that her failure to complete the Series Three course was in some way related to her rejection of Mr. Gannon's sexual advances.

In light of our determination that Ms. Dockter was not subjected to sexual harassment which can be remedied under Title VII, we do not address the issue of whether Rudolf Wolff, the corporate employer, may be held responsible for the actions of its supervisor, James Gannon.

### III. Conclusion

Accordingly, we AFFIRM the district court's decision in favor of Rudolf Wolff on Ms. Dockter's Title VII claims.