**Candy PAAPE, Plaintiff,**

v.

**WALL DATA, INC., Defendant.**

No. 95 C 421.

United States District Court, N.D. Illinois, Eastern Division.

July 8, 1996.

Arthur R. Ehrlich of Goldman & Ehrlich, Chicago, IL, for Plaintiff.

Kristin E. Michaels and J. Stephen Poor of Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for Defendant.

1. See Appendix.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Candy Paape ("Paape") has sued her former employer Wall Data, Inc. ("Wall Data"), charging it with sexual harassment and sex discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–17. Paape also invokes this Court's supplemental jurisdiction under 28 U.S.C. § 1367(a) to assert a state law claim of breach of contract in violation of the Illinois Sales Representative Act, 820 ILCS 120/1 to 120/3. Wall Data has moved for summary judgment pursuant to Fed.R.Civ.P. ("Rule") 56, and its motion is fully briefed and—despite some difficulties posed by Paape's failure to adhere fully to the requirements of this District Court's General Rule ("GR") 12(M) and 12(N) [1]—ready for decision. For the reasons stated in this memorandum opinion and order, Wall Data's motion is granted in part and denied in part.

### Summary Judgment Standards

■ Familiar Rule 56 standards impose on Wall Data the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is "not required to draw every conceivable inference from the record—only those inferences that are reasonable"—in the light most favorable to Paape (*Bank Leumi Le–Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991) and cases cited there). While "this general standard is applied with added rigor in employment discrimination cases, where intent is inevitably the central issue" (*McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 370–71 (7th Cir.1992)), that does not negate the potential for summary judgment in cases where a movant plainly satisfies the Rule 56 standards (*Washington v. Lake County*, 969 F.2d 250, 254 (7th Cir.1992)).

As in any summary judgment proceeding, this Court accepts nonmovant Paape's version of any disputed facts. What follows is a version of the facts culled from the parties'

submissions (see Appendix), with any differences between the two resolved in Paape's favor. Other relevant facts, which fit somewhat better into the substantive legal discussion, will be set out later in the opinion.

### Facts

Wall Data is a software publishing company with over 30 offices in the United States, the United Kingdom and Canada. It specializes in connectivity software, which enables mainframe and mid-range computers to interface with personal computers (D. 12(M) ¶¶ 1–2).

In October 1992 Paape met with Wall Data Regional Manager Jim Maguire ("Maguire") to interview for the position of application systems group territory manager ("ASG") (D. 12(M) ¶¶ 4–5; Paape Aff. ¶ 1). During that interview Maguire asked Paape (among other things) questions as to whether she was "strong-willed" enough to handle herself in dealing with the men she would encounter in a sales environment—specifically how she would handle any sexual advances made by potential customers (Paape Dep. 21–23; Paape Aff. ¶ 1).

Shortly thereafter Maguire recommended to Wall Data Vice President of North American Sales Jim Robb ("Robb") that Wall Data hire Paape as an ASG. Although Robb was concerned about doing so because he felt that Paape lacked sales experience, she was hired in November 1992 as an ASG in Wall Data's Itasca, Illinois office[2]—a regional sales office managed by Maguire that handled accounts in 12 midwestern states (D. 12(M) ¶¶ 3–4, 7–9; Robb Dep. 29). But Paape's tenure as an ASG was to be short-lived, because in January 1993 Wall Data made the decision to phase out the ASG position in all its offices (D. 12(M) ¶ 10).

During the first week of February 1993, Wall Data held a company sales meetings in San Francisco.[3] After dinner one evening, Paape was standing with a group of co-workers when Maguire approached her, put a condom in her hand and asked her if she would sleep with him (Paape Dep. 88–89; Paape Aff. ¶ 2). Throughout that evening Maguire continued to make advances toward Paape including putting his arms around her, grabbing her head and trying to kiss her (id.; Paape Dep. 130–31). At one point he told her that if she did not give in to him sexually she would be assigned to manage a less desirable sales territory (Paape Dep. 192; Paape Aff. ¶ 2).[4] When Maguire tried to make amends the next day by apologizing for his behavior, Paape "asked him if it was going to affect my territory and my job working there." Maguire responded that it would not (Paape Dep. 135–36).[5]

---

2. To be precise, Paape was initially employed in Wall Data's Schaumburg, Illinois office, but that office was moved to Itasca (D. 12(M) ¶ 3).

3. Paape swears that some time before that San Francisco sales meeting Maguire told her that she was going to be made a territory manager—a sales representative in charge of selling Wall Data software in a specific territory—but that she had not yet been assigned such a territory (Paape Aff. ¶ 2). For its part, Wall Data contends that Paape was not actually offered that position until after the San Francisco meeting (see D.R.Mem. 12), and according to Maguire no consideration had been given to the possibility of making Paape a territory manager before that meeting (Maguire Dep. 70–72). What is undisputed is that Wall Data did not intend automatically to convert all ASGs into territory managers (Alexander Aff. ¶ 4, Ex. C to D. R.Mem.) and that at some point Maguire made a request to his Wall Data superiors that the company make Paape a territory manager (id. at ¶ 5; D. 12(M) ¶ 11). Even if it is true that Paape was not actually offered the position until after the San Francisco meeting, this Court must accept as true Paape's assertion that Maguire had told her earlier that it was going to happen.

4. Wall Data's response to Paape Aff. ¶ 2 (a response apparently necessitated by Paape's failure to follow GR 12(N), as referred to in the Appendix) contends that Paape never mentioned in her deposition that Maguire told her that her territory would suffer if she did not give in to him sexually. If that were true, her affidavit on that score might pose the type of problem identified in Russell v. Acme–Evans Co., 51 F.3d 64, 67–68 (7th Cir.1995). But it turns out that during her deposition—in a passage not cited by Paape but found by this Court—Paape did in fact state "in San Francisco, Jim Maguire made a statement to me that if I did not give in to him sexually, that my territory would suffer" (Paape Dep. 192).

5. Maguire's account of that evening is quite different—he denies having made any advances toward Paape (Maguire Dep. 65–70).

After the San Francisco meeting Paape was given a territory manager position in the same office where she had previously been employed. That sales territory was part of Illinois, a state that had previously been divided between two territory managers, Mike Burke ("Burke") and Paul Mallon ("Mallon").[6] So Paape's territory had to be created by carving portions out of Burke's and Mallon's turf (D. 12(M) ¶¶ 11–12).[7]

In mid to late February Maguire met with Burke, Mallon and Paape and divvied up the territory among them (Paape Dep. 45; Maguire Dep. 33–36; Burke Aff. ¶ 5). Maguire took portions of Burke's and Mallon's territories (DuPage, Kane and McHenry Counties, a portion of Cook County and the City of Rockford) and gave them to Paape, while Mallon kept the City of Chicago and a portion of Lake County and Burke retained southern Illinois, Indiana and Missouri (D. 12(M) ¶ 12; see P.Ex. 1 and Paape Dep.Ex. 5 for a more specific description of Paape's territory). Burke and Mallon each retained certain accounts in Paape's newly-created territory, and Paape was given a few accounts within Burke's and Mallon's territories (D. 12(M) ¶ 14; Paape Dep. 44–49, 55–56, 173–80; Paape Aff. ¶¶ 5–6; P.Ex. 1).[8]

Wall Data territory managers were required to meet annual sales quotas (Robb Dep. 18). Because he felt that Paape was "less qualified than some of the other territory managers" (Maguire Dep. 26), Maguire gave Paape a yearly quota of $1.2 million in sales (prorated because she did not start as a territory manager at the beginning of the year), the lowest quota that he was authorized to give (D. 12(M) ¶ 22).[9] In addition Paape was to establish a pipeline of accounts with a potential revenue of four times the amount of her annual quota, and she was also required to make at least three face-to-face sales calls per day, with a minimum of 15 calls per week (D. 12(M) ¶ 24; Paape Dep. Ex. 4). Maguire discussed those job requirements with Paape, and he gave her a "Performance Plan" that said Paape should average at least $100,000 in sales per month and a "Compensation Plan" that described Paape's sales territory and listed her 1993 annual quota as $1.2 million (D. 12(M) ¶¶ 24–25; Paape Dep. 39–43; Paape Dep.Ex. 4). Maguire also told Paape that it would take her "at least one year to develop that territory, because the given accounts that were established were given to Paul [Mallon] and Mike [Burke]," but that statement is not reflected in either the Performance Plan or the Compensation Plan (Paape Dep. 180–81; Paape Aff. ¶ 7).

Paape testified that between the time she was originally assigned her territory and October 1993, Maguire changed her territory three times (Paape Dep. 49). In the first instance (in March) Paape stated that she lost "chunks of zip codes, areas" and accounts but could not recall what areas or accounts were taken (Paape Dep. 57–58, 62–63). In the second (in July) Paape was given Burke's Abbott Laboratories account but her territory was "made smaller" (Paape Dep. 58–59; D. 12(M) ¶ 20). But the third instance (in October) was a nonevent: Although a potential change was proposed, it did not take place (Paape Dep. 59–61). Also, in mid–1993 Maguire took the State of Missouri from Burke and did not give him any territory in exchange (D. 12(M) ¶ 20).

In October 1993 Maguire told Paape that her performance was inadequate because she was well below her sales quota.[10] He told her that she needed to make $100,000 in

6. Burke and Mallon had been territory managers since 1991 (D. 12(M) ¶ 23).

7. Wall Data experienced tremendous growth between 1990 and 1994—its sales force increased from two salespeople in 1990 to 80 or 90 in 1994. As new territory managers were added to the sales force, the size of the existing territory managers' territories was consequently decreased (Robb Dep. 19–20).

8. More later on the subject of the distribution of sales territories and accounts.

9. At that time Wall Data Regional Managers such as Maguire were authorized to give territory managers either a $1.2 million or a $1.6 million sales quota (Maguire Dep. 25–26). Each of Burke and Mallon was required to meet a $1.6 million sales quota for 1993 (D. 12(M) ¶ 22).

10. By the end of October 1993 Paape's total sales came to $394,609—an amount below the $1.2 million yearly (or $100,000 monthly) quota (D. 12(M) ¶ 32).

sales per month (Paape Dep. 84–85, 103–04). And he put her on a "Performance Plan" that stated that her monthly sales should average $100,000 per month and that "[a]nything less than this could lead to disciplinary action up to and including termination" (Paape Dep. Ex. 13; D. 12(M) ¶ 31). Robb was also concerned about Paape's performance because she was below quota (Robb Dep. 28–31).

Also in October, Paape asked Maguire to enlarge her territory—a request that she had been making on a monthly basis (Paape Dep. 204–05), including her request sometime during the summer of 1993 that she be reassigned the recently vacated State of Wisconsin (Paape Dep. 182–86; Paape Aff. ¶ 9; P.Ex. 5). Maguire responded that she should "stop whining" and that "there was something that [she] could do to increase [her] sales or to get a better territory." Based on "the way he said it" and "the way he leaned across the desk and looked at me," Paape understood that he was referring to sexual favors (Paape Dep. 211–13; Paape Aff. ¶ 17).

On November 10, 1993 Maguire met with Paape (D. 12(M) ¶ 34). At that point she was not close to meeting her sales quota (see n. 10; Paape Dep. 242).[11] At the meeting Maguire told Paape that it did not appear that there was any way she was going to meet her sales quota and asked her to resign (D. 12(M) ¶ 37). Although Paape claimed that she had several potential sales in the works, she admitted during her deposition that even if all of her then potential sales went through, she would not have met her sales quota (Paape Dep. 242; D. 12(M) ¶ 40).[12] Paape refused to resign, and at the end of the meeting Maguire fired her (D. 12(M) ¶ 41). Robb did not disagree with Maguire's decision to terminate Paape (Robb Dep. 37).

*Sexual Harassment*

■ Title VII's prohibition against discrimination on the basis of sex includes sexual harassment (*Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66–67, 106 S.Ct. 2399, 2405–06, 91 L.Ed.2d 49 (1986)). Such claims may be based on either (1) a "quid pro quo" theory where submission to sexual demands is made a condition of tangible employment benefits (*Dockter v. Rudolf Wolff Futures, Inc.*, 913 F.2d 456, 461 (7th Cir.1990)) or (2) a "hostile environment" theory where an employer's conduct—or conduct by an employee that is attributed to the employer—creates a work environment that is hostile or abusive to the plaintiff (*Saxton v. AT & T Co.*, 10 F.3d 526, 533 (7th Cir.1993)). Paape has asserted both theories against Wall Data.

*Quid Pro Quo*

*Dockter*, 913 F.2d at 461, citing *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1413 (10th Cir.1987), defines quid pro quo sexual harassment:

> This type of sexual harassment describes situations in which submission to sexual demands is made a condition of tangible employment benefits.

Given the evidentiary standards that govern Rule 56 motions, a reasonable jury could surely conclude that Maguire was possessed of an impermissible motive both when he originally assigned and later when he refused to enlarge Paape's sales territory. If Paape is to be believed (and she must be), in February 1993 Maguire explicitly threatened her that if she refused to give in to him sexually her territory would suffer, then in October 1993 he implied that if she would succumb to his sexual demands she would be given a better territory[13]—and shortly thereafter (in

---

**11.** Before the meeting Maguire had visited some of Paape's accounts to review whether she had any potential sales to those accounts. And he consulted with Robb and Wall Data Director of Human Resources Lynn Sederholm about terminating Paape for failure to meet her sales quota (D. 12(M) ¶ 35–36). As for the decision to terminate Paape, although Robb "raised the question from a performance standpoint," it was left up to Maguire to make the ultimate decision (Robb Dep. 30–31).

**12.** Apparently none of those potential deals was actually consummated (D. 12(M) ¶ 38–39).

**13.** That October incident is concededly ambiguous. But on the present motion Paape's interpretation of Maguire's comment will be credited, for the incident really poses an issue for the trier of fact.

November) Maguire recommended that Paape be fired.[14]

But of course bad intentions alone are not enough. As this Court has recently observed in *Rushing v. United Airlines,* 919 F.Supp. 1101, 1109 (N.D.Ill.1996) (footnote and citation to *Dockter,* 913 F.2d at 461, omitted):

Some adverse job consequence must actually have resulted from the employee's refusal to submit to the requested conduct. In other words, the employee must be tangibly worse off because of his or her refusal to succumb than he or she would have been had the supervisor's request for sex never been made.

See also *Hicks,* 833 F.2d at 1414.

■ Here Paape claims that because she would not submit to Maguire's sexual overtures, he (1) made good on his threat by unfairly assigning her to a sales territory with such poor sales potential that she was unable to meet her quota, (2) refused to enlarge that territory and (3) ultimately caused her to be fired. Wall Data counters by essentially arguing "no harm, no foul": It contends that Maguire did not in fact assign her to a poor territory or otherwise treat her adversely and that she was ultimately fired because she was well below her sales quota.

So the next step in the analysis would appear to be an examination of whether Paape's sales territory as assigned by Maguire really had such poor sales potential that Paape did not have a reasonable shot at making her quota. But before that step is taken, a few words are in order as to the consequences of a negative answer to that question. On the present record Maguire would then have a twofold basis for firing Paape: an illegal desire to retaliate for her sexual resistance and a legal desire to get rid of an underproductive salesperson. *Price Waterhouse v. Hopkins,* 490 U.S. 228, 244–45, 259–60, 261, 109 S.Ct. 1775, 1787–88, 1795–96, 1796, 104 L.Ed.2d 268 (1989) has taught that in such "mixed motive" situations the burden shifts to the employer to prove that the adverse employment decision—here Paape's firing—would have been reached even without the impermissible motive. And Congress has since imposed an even more demanding standard. Under the Civil Rights Act of 1991 (42 U.S.C. § 2000e–2(m)), which applies to this case, an employment decision is illegal "if it was motivated at all by an illegal motive" (*Pilditch v. Board of Educ.,* 3 F.3d 1113, 1118 n. 2 (7th Cir.1993)). Here that is surely a matter for resolution by a factfinder rather than by a court as a matter of law.[15]

So it would appear that Paape need not prove the inherently unsatisfactory nature of her assigned territory[16] as an essential ingredient of her quid pro quo claim. But in the interest of completeness this opinion will go on to look at that question, for if Paape is right on that score it would be difficult for Wall Data to argue that her ultimate termination was not inevitably poisoned by that original act of harassment.[17]

At Wall Data the goal was to provide each territory manager with a sales territory that gave a fair opportunity to meet his or her quota (Robb Dep. 33–36). So the question is: Was that done in Paape's situation? From its very nature that question is highly fact-

---

**14.** Most plaintiffs these days are unable to proffer such direct "smoking-gun" type evidence of a statutorily prohibited intent (see *Troupe v. May Dep't Stores Co.,* 20 F.3d 734, 736 (7th Cir. 1994)).

**15.** After all, it is unfortunately not just in books and movies that an inadequate female employee may be kept on only because she is sleeping with the boss. And the corollary is that the same employee may be fired because she *refuses* to do so, while she would not have been fired just because of her business-related shortcomings.

**16.** Of course, in the present summary judgment context Paape does not have to "prove" that or

any other potentially outcome-determinative matter. Rather, her burden is the lesser one of showing the existence of a genuine issue of material fact.

**17.** Although it is undisputed that Paape was well below her sales quota throughout her employment as a territory manager, her claim is that Maguire's actions effectively put her into a position of being unable to meet that quota. If Paape was really stuck with a poor territory because of her refusal to accede to Maguire's sexual demands, her later termination—for failure to meet an unmeetable sales quota—could of course be viewed as an inevitable byproduct of that original act of quid pro quo harassment.

sensitive,[18] and the difficulty in answering it is compounded by the lack of helpful information in the record. This Court has been given nothing more to work with than general geographical descriptions of sales territories and the names of some existing accounts and other companies that were in Paape's and other territory managers' territories. On this record it is difficult to see how anyone unfamiliar with the industry—and most importantly for our purposes a factfinder at trial—could make much more than a guess as to whether any given territory could reasonably be viewed as having the potential to support a specific quota for software of the type that Wall Data was marketing.

But with the burden of demonstrating a factual issue resting on Paape, Wall Data leans heavily on her inability to establish that she was indeed treated adversely in territorial terms.[19] And it is true that much of what Paape has tendered on this question is difficult if not impossible to decipher and of highly questionable probative value (see P.Ex. 6–8; see also P. 12(N) ¶¶ 12–13, 18; Paape Aff. ¶ 3, 10–12). If all Paape had were those exhibits and her own self-serving opinion, she would be hard pressed to prevail on the issue.

But Paape has something more than that. For one thing, she can draw on her own experience (as contrasted with mere opinion): She worked the territory for several months—and would no doubt testify that she did so. with some diligence (see Paape Dep. 85, 104–05; P.Ex. 19)—and she was unable to come close to meeting her quota. And perhaps more telling, Maguire himself told Paape that it would take her "at least one year to develop" that territory.[20] That of course could reasonably be viewed as evidence that the territory was not as hot as Wall Data now contends.[21]

In summary on Paape's claim of quid pro quo harassment, there is certainly a triable issue of fact as to Maguire's improper motive. And either of two paths could lead a reasonable factfinder to link that motive to Paape's adverse treatment. That combination allows Paape to avoid summary judgment.

*Hostile Environment*

■ Title VII also puts the kibosh on discriminatory conduct that has "the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment" (*Dey v. Colt Constr. & Dev. Co.,* 28 F.3d 1446, 1453–54 (7th Cir.1994), quoting

---

18. As Robb testified (Robb Dep. 33–34):

> A territory—and maybe this will help you out. A territory—a physical territory doesn't necessarily mean anything. And let me explain to you why.
>
> If I have a person that has downtown New York and Manhattan, the physical territory size is probably one of the smallest in the United States. However, potential-wise it might be one of the greatest.
>
> So it's hard—when you have a product that Wall Data had, we had people in Kansas City or Minneapolis that other people would probably think that's a lousy territory who made tremendous amounts of money.
>
> So I don't know how a fair territory—and that's our objective we were trying to do for everyone in the United States. In other words, if we gave them a quota, our objective was to make sure that they had the opportunity to create or to build or to make quota, that they had a good shot at that.
>
> And—but to come up with and say a geographical specified area, this is worth more than that one or that, I don't know how you—I'm not quite sure how to do that.... I'm not sure that there was a magic formula that did that.

19. Wall Data also points to various facts that, it contends, show that Maguire actually treated Paape better than other territory managers (see D.Mem. 1–2, 4–9; see also D.R.Mem. 1, discussing the "irony of Plaintiff's claims"). Paape of course disputes some facts and refutes Wall Data's spin on others (see P.Mem. 8–10). And it must again be remembered that although a jury could well buy many of Wall Data's arguments—not to mention its version of critical facts—on the current motion this Court is bound to grant Paape the benefit of all reasonable favorable inferences.

20. On the other side of the coin, Wall Data contends that after Paape was fired her territory was split between two new territory managers (D. 12(M) ¶¶ 44–46). Even if true—and Paape contends that it is not wholly accurate (P. 12(N) ¶ 45)—it will certainly help Wall Data at trial, but it is not so conclusive as to foreclose Paape's claim at this stage.

21. Further, Maguire's later acknowledgment that he "knew how she could get a better territory" could be viewed as an implicit acknowledgment that he did in fact carry out his February threat.

the same EEOC Guidelines as quoted in *Meritor*, 477 U.S. at 65, 106 S.Ct. at 2404–05). But to be actionable such conduct must meet a threshold level of severity. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 20–22, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993) (see also *Dey*, 28 F.3d at 1453–54) has set the standards:

> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

■ Although the same conduct that forms the basis of a quid pro quo claim can also serve as evidence in support of a claim of hostile environment, they are two quite distinct theories of liability. And as *Harris*, 510 U.S. at 22–24, 114 S.Ct. at 371 went on to say:

> But we can say that whether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

■ Here Paape's hostile environment claim rests in part on the matters already mentioned in connection with her quid pro quo claim—Maguire's questions at Paape's initial interview (in October 1992), his conduct at the San Francisco sales meeting (in February 1993) and his suggestive response to Paape's request to have her territory enlarged (in October 1993). She also adds a few other ingredients to the mix:

1. At many weekly meetings Maguire frequently yelled at, swore at and berated her in front of the male territory managers, to the point that on several occasions she was reduced to tears (Paape Aff. ¶ 18).

He also told her to "get off [her] ass and stop complaining" (*id.*), made comments about "dumb blonds" in her presence and suggested that Paape looked like Michelle Golab ("Golab"), another Wall Data employee, because both Paape and Golab were tall and blonde (D. 12(M) ¶ 51).

2. During her November 10, 1993 meeting with Maguire—the day on which Paape was fired—Maguire "swore and yelled and screamed" at her (Paape Dep. 197).

It does appear that Paape has exaggerated those last-mentioned items somewhat. Although her affidavit, in mentioning Maguire's behavior at meetings, states that she "never saw [Maguire] do this to male employees" (Paape Aff. ¶ 18), her deposition testimony is at odds with that. When asked about Maguire's inappropriate behavior during meetings, Paape responded that Maguire would swear and that "[i]f he was upset, he would be upset with everybody in the region" (Paape Dep. 106).[22] And Wall Data has submitted an affidavit by Burke stating that Maguire yelled at him on occasion and that he personally witnessed Maguire yell at other territory managers (Burke Aff. ¶ 8, Ex. A to D.R.Mem.).

■ Title VII's focus on sexually discriminatory conduct does not operate as a general ban on yelling, swearing, screaming and other rude or offensive behavior (see *Hicks*, 833 F.2d at 1415, holding that although acts underlying sexual harassment claim do not have to be sexual in nature, the acts must have taken place because of the employee's sex). Despite Maguire's use of the "dumb blond" stereotype when Paape was the target of his criticism, on the record (see the preceding paragraph and n. 23) Maguire was an equal opportunity screamer and curser—so it is not a reasonable inference that his yelling and swearing was directed at Paape just because she is a woman (see *Galloway v. General Motors Serv. Parts Operations*, 78 F.3d 1164, 1167–68 (7th Cir.1996)). Most importantly, though the evidence has been found adequate to support a quid pro quo claim, under the standards set by our Court of Appeals' deci-

---

22. As between her affidavit and her live testimony, the latter controls (*Russell*, 51 F.3d at 67–68).

sions (see *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 444 nn. 2 and 3 (7th Cir.1994) and cases cited there; *Koelsch v. Beltone Elec. Corp.*, 46 F.3d 705, 708 (7th Cir.1995)) a reasonable jury could not find it sufficiently severe or pervasive to rise to the level of actionable hostile-environment sexual harassment.

There is one last nail in the coffin of Paape's hostile environment claim: She never complained to anyone above Maguire at Wall Data about his conduct (Paape Dep. 154, 202). In that circumstance she has not established the predicate for holding Wall Data liable for Maguire's conduct in any event (see this Court's opinion in *Jansen v. Packaging Corp. of Am.*, 895 F.Supp. 1053, 1060–64 (N.D.Ill.1995)).

### *Sex Discrimination Generally*

Paape has also advanced a general claim of sex discrimination. To survive summary judgment on any such claim, a plaintiff in Paape's position must either (1) produce evidence—direct or circumstantial—sufficient to support a finding of discriminatory intent or (2) successfully navigate the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) burden-shifting framework (*Kormoczy v. Secretary, HUD*, 53 F.3d 821, 824 (7th Cir.1995)).

Apart from the already-discussed quid pro quo evidence (which would render the more general inquiry needlessly duplicative), Paape has not produced any evidence to support a finding of sex-discriminatory animus— she has not even tried (see P. Mem. 6–12, focusing only on the prima facie case and pretext).[23] Thus Paape and Wall Data would be relegated "to dancing through the

*McDonnell Douglas* quadrille" (*Shager v. Upjohn Co.*, 913 F.2d 398, 401 (7th Cir.1990)). But in that respect the process would add nothing to the already-completed quid pro quo analysis. For example, if Wall Data is guilty of quid pro quo harassment, then its asserted "legitimate, nondiscriminatory" reasons for its actions either are a sham or are subject to the *Price Waterhouse* approach. Conversely, if a jury did not buy Paape's version of events in the quid pro quo context, she would obviously have failed to establish that Wall Data's reason for her termination was a pretext for sex-based bias.[24] There is really nothing to be gained from trying to shoehorn what is most appropriately characterized as a quid pro quo case into a more general claim of sex discrimination.

### *State Law Claim*

Finally, Paape claims that Wall Data breached its contract with her and violated the Illinois Sales Representative Act (820 ILCS 120/1 to 120/3) by not paying her commissions due her for some of the sales that she made. In those terms the claim is misguided, for that statute plainly does not apply to Paape. Its definition of "sales representative" does not include "one who qualifies as an employee of the principal pursuant to the Illinois Wage Payment and Collection Act" (820 ILCS 120/1(4)). And the latter statute (820 ILCS 115/2) defines an employee as "any individual permitted to work by an employer in an occupation," though it does not include a person (1) who is free from control over the performance of the work, (2) who performs work that is either outside the usual course of business or is performed

---

**23.** In fact, the only evidence that even arguably cuts in that direction was not even mentioned by Paape, but was found by this Court: According to Paape, Maguire made "comments about men selling better than women" and made a joke about how women "could be bought" (Paape Dep. 194–95). But that alone is not enough to support a finding of sex discriminatory animus in terms of the decisions relating to Paape's employment (see *Fuka v. Thomson Consumer Elec.*, 82 F.3d 1397, 1403–04 (7th Cir.1996)).

**24.** Relatedly, if a jury were to disbelieve Paape's contention that she was given an infertile sales territory, she would face difficulty in establishing

two essential elements of her prima facie case: (1) that she performed her job satisfactorily and (2) that Wall Data treated similarly situated employees outside of her class more favorably (see *Hughes v. Brown*, 20 F.3d 745, 746 (7th Cir. 1994))—especially in light of the undisputed facts that between 1992 and 1994 Maguire recommended the termination of five people other than Paape for failure to meet their sales quotas and that (1) all five were *male* and (2) all met a *higher* percentage of their sales quota than Paape (D. 12(M) ¶ 43; see P. 12(N) ¶ 43. Paape disputes D. 12(M) ¶ 43 only by contending that those employees had sales territories with greater potential.

outside all of the employer's places of business unless the employer is in the business of contracting with third parties for the placement of employees and (3) who is in an independently established trade, occupation, profession or business—a set of standards that Paape clearly did not fit.

■ But it does not matter that Paape has mislabeled her claim (*Tolle v. Carroll Touch, Inc.*, 977 F.2d 1129, 1134 (7th Cir. 1992) and cases cited there). She may still bring a breach of contract action for any commissions allegedly due, and this opinion will proceed on that basis.

By way of background, on November 10, 1993—the day that Paape was fired—she told Maguire that she was owed commissions for certain sales that she had made (D. 12(M) ¶ 59). And Paape gave Maguire a list of sales on which she claimed she was entitled to commissions. Maguire reviewed Paape's documentation and concluded that she might be owed commissions on approximately $61,532 in sales. Maguire then prepared a list of those sales and forwarded it to Wall Data Sales Administrative Supervisor Yvonne Chinn ("Chinn") (D. 12(M) ¶¶ 60, 63–65).

In turn Chinn researched the sales on the list, concluded that Paape had already received credit for some of the sales, found that she was not entitled to credit for other sales because they were to named accounts of other territory managers and determined that Paape was owed commissions on approximately $35,192 in sales (D. 12(M) ¶ 66). On November 17 Chinn's commission calculation was submitted to and approved by Wall Data North American Sales Program Manager John Alexander (D. 12(M) ¶ 67). And on November 30 (some three weeks after Paape's firing) Wall Data issued her a check in the gross amount of $2,741.00 as her commission on the $35,192 in sales (D. 12(M) ¶ 68).

Paape's sole challenge as to the sales investigated by Chinn is that Wall Data "does not explain how it arrived at the figures in question" (P. Mem. 17; P 12(N) ¶¶ 65–69).[25] But it is ultimately her burden to show that she was in fact denied commissions properly due her. Paape's attempt to pawn that burden off on Wall Data, rather than her producing evidence of the wrongful denial of commissions for any of those sales, is not an appropriate way to avoid summary judgment. To the extent then that Paape claims that she is due commissions for any of the sales forwarded from Maguire to Chinn and investigated by Chinn, any such claim is dismissed.

Relatedly Paape claims that she was "deprived of $15,328 in sales in September 1993 when Defendant made an 'adjustment' to her monthly sales statement" and that Wall Data "has never provided Plaintiff with an explanation for this 'adjustment'" (P. Mem. 17). Even apart from the inappropriateness of the attempted burden shifting reflected in those statements, the only thing that Paape offers in support is her own answer to a Wall Data interrogatory. Therefore any claim based on that salary adjustment is also dismissed.

■ Paape does however have a commissions claim that stands on a footing somewhat different from those just mentioned—she has at least produced some evidence of a viable claim to those commissions. According to Paape Aff. ¶ 20, Wall Data "failed to give me credit for approximately $185,000 in sales in addition to the amount that Maguire sent off to the corporate office" and Maguire "ignored many of the documents" that she produced in support of those sales. Paape also claims that she was to receive credit for some sales to Waste Management but that

---

25. Paape's GR 12(N) response to D. 12(M) ¶¶ 65–69 says only this:

> 65.–69. Deny. Defendant only investigated that portion of sales which Maguire forwarded to the attention of Yvonne Chinn. There were an additional $185,000 in sales which Maguire refused to consider or look at and which WALL DATA, therefore, did not investigate. Although Chinn claims that Plaintiff was only owed commissions on $35,192 of the limited

> portion of sales which Maguire forwarded to her, the affidavit and exhibits do not indicate how she made these calculations.

Because Paape has included no record citations for her general denial of D. 12(M) ¶¶ 65–69, the facts stated there must be accepted as true. To the extent that the remainder of Paape's response can be said to allege additional facts, they may be credited if the record supports them—a matter discussed hereafter.

the credit erroneously went to Mallon (P.Mem. 16; Paape Dep. 176), and that (Paape Aff. ¶ 19):

> On many occasions, a reseller would ship directly to one of my customers or accounts. The sale would be made through my efforts and I would ordinarily receive the credit for the sale. On several occasions, however, the reseller would only list the zip code where the account was located and not the name of the account. If the account was located in one of the zip codes assigned to another territory manager, I would not receive any credit even though it was my sale and account. This would frequently happen with the Walgreens account that was located within another person's territory. I presented documents to Maguire, such as Exhibits 18 and 19A,[26] showing the amount of sales to which I was wrongfully denied credit. I would not receive the proper credit, however, and would have to give him another set of copies because he would claim that he lost the last set.

Again, as with the sales territory issue, this Court is operating in a vacuum (or perhaps more accurately a fog) because Paape has offered nothing more concrete or particularized than these general assertions to back up her claims, and because the proffered documents need more elaboration to be comprehensible to anyone outside of the industry. But the need to accept Paape's version of the facts, even if supported solely by her own deposition testimony and affidavit, enables her to survive Wall Data's motion on the sales commission issue except in the respects rejected earlier in this section. Paape should be forewarned, however, that although her claim cannot be dispatched on the present paper record, the manner in which the evidence plays out at trial may perhaps trigger the operation of Rule 50(a).

### Conclusion

Wall Data has not met its burden of establishing the lack of a genuine issue of material fact as to Paape's claims of quid pro quo

sexual harassment and breach of contract. Its Rule 56 motion on those claims is therefore denied. But Wall Data has met that burden as to Paape's claims of hostile environment sexual harassment and of sex discrimination generally (beyond the boundaries of her quid pro quo claim). Hence those claims are dismissed. Finally, Paape's state law claim is reduced to the limited extent discussed in this opinion.

### Appendix

This District Court has designed GR 12(M) and (N) to facilitate the resolution of Rule 56 motions by highlighting the existence or nonexistence of factual disputes. GR 12(M) requires the movant to submit a statement of assertedly uncontested facts, with citations to the record in support of those facts. Then GR 12(N) requires the nonmovant to file:

> (3) a concise response to the movant's statement that shall contain
>
> (a) a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to affidavits, parts of the record, and other supporting materials relied upon, and
>
> (b) a statement, consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon. All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party.

This Appendix has been occasioned by several deficiencies in Paape's GR 12(N) response:

1. Paape has chosen to respond only to certain paragraphs of Wall Data's GR 12(M) statement, so the paragraphs not responded to will be deemed admitted. And in a few of her responses, Paape does not cite to the record to support her denial of Wall Data's factual assertions (see e.g., Paape's response to D. 12(M) ¶¶ 65–69).

2. Paape's response has included a copy of Paape's affidavit and a narrative

---

**26.** [Footnote by this Court] Those exhibits, much like the exhibits that Paape produced relating to the sales territory issue, are less than self-explan- atory and shed very little light on whether Paape was or was not denied commissions that she was entitled to.

"Facts" section that, while citing to the record,[1] does not follow the GR 12(N)(3)(b) requirement that any additional facts are to be set forth in "short numbered paragraphs."

3. Paape's citations pose another problem: In several instances in the Facts section and in other portions of her Memorandum, Paape merely cites (for example) "Plaintiff's Dep." without including a reference to specific page numbers.[2]

Despite that, this Court was able to cull from the record the information necessary to rule on the current motion.

Under the circumstances, Paape was really fortunate to dodge the Rule 56 bullet: Suffice it to say that it would be in the best interest of her counsel to be more careful in following GR 12(N) in the future (see *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 921–24 (7th Cir.1994); *Flaherty v. Gas Research Inst.*, 31 F.3d 451, 453 (7th Cir. 1994)).

---

1. Even if a party provides record citations, any statement of fact or response will be credited only if the citation supports that statement or response. Of course no unsupported statement or mischaracterization of the record will be credited as a fact.

2. Paape also did not furnish this Court with a copy of her deposition (and Wall Data had earlier produced only excerpts of that deposition in support of its motion). So even if this Court were inclined to scour the deposition in search of supporting references (see the opinion's n. 4 for an example), it would have had to—as it eventually did—request a copy of the entire deposition.